215 P.3d 990 (2009)
DEEP WATER BREWING, LLC, a Washington limited liability company; Robert D. Kenagy and Roberta D. Kenagy, husband and wife, and the marital community composed thereof, Respondents,
v.
FAIRWAY RESOURCES LIMITED, a Washington limited liability company, and John Does 2-42, Defendants,
Key Development Corporation, a Washington corporation; Key Bay Homeowners Association, a Washington nonprofit corporation; Jack A. Johnson and Jane Doe Johnson, husband and wife, and the marital community composed thereof; and Michael Taylor and Patricia Taylor, and the marital community composed thereof, Appellants.
Nos. 27014-9-III, 27024-6-III.
Court of Appeals of Washington, Division 3.
September 10, 2009.
*996 Stephan E. Todd, Attorney at Law, Bothell, WA, Robert B. Jackson, Attorney at Law, Bellevue, WA, for Appellants.
Paul S. Kube, Julie K. Norton, Ogden Murphy Wallace PLLC, Wenatchee, WA, for Respondents.
SWEENEY, J.
¶ 1 This suit follows a dispute between a developer and a restaurant owner. The restaurant owner's predecessor in interest granted the developer a right-of-way in exchange for money and the developer's promise to restrict the height of houses in the development so as not to impair the view of Lake Chelan from the restaurant building. The trial court concluded that the developer ultimately breached that agreement and that the development's homeowners association and its president tortiously interfered with the agreement. The court awarded the restaurant owner damages and attorney fees. We conclude that the restaurant owner was entitled to enforce the height restriction covenant as one that runs with the land. We also uphold the tort liability of the homeowners association president and the association. We remand for the court to revisit the attorney fees and for entry of necessary findings and conclusions to support any award of attorney fees and costs.

FACTS
¶ 2 History. Cindy Smith and Robert Ahlquist (Ahlquist) are siblings. They owned and operated the Cosina del Lago Restaurant overlooking Lake Chelan in Washington state. The dining room was on the second floor of the building and the lounge was on the first floor. The land between the restaurant building and the lake was a mature apple orchard.
¶ 3 Jack Johnson is the sole shareholder and president of Key Development Corporation. David Milne was president of Fairway Resources, Ltd. They wanted to develop the property between the restaurant and the lake for single family housing. But any development required access over Ahlquist's property. Toward that end, Mr. Johnson presented Ahlquist with a signed easement that included a provision that "[a] restrictive covenant shall be placed on the face of the plat to be developed by Fairway stating the [sic] no building will be constructed that will obscure the view from Cosina del Lago Restaurant." Ex. 37; Clerk's Papers (CP) at 639 (I Finding of Fact[1] (FF) 1.18). The *997 proposed easement covered only the upper floor (the restaurant) view and so Ahlquist refused to sign.
¶ 4 Ahlquist referred the matter to their attorney. He drafted an easement agreement and included protection for the view from the lounge:
The Corporation warrants and covenants that it shall establish and monitor compliance with all necessary building covenants in its development so as to not affect the sight or views from Cosina del Lago restaurant to the lake. There shall not be any homes or structures in the development that interfere with the view of the lake from the restaurant or its lounge.
Ex. 2; CP at 640 (I FF 1.20). The new document was entitled "Do Not Record Agreement" but amounted to an easement across Ahlquist's property. Ahlquist's attorney titled the document "Do Not Record Agreement" because he was "concerned about the character of the individuals we were dealing with" and wanted to ensure that all compensation and consideration for the right to the easement was received before recording. Report of Proceedings (RP) at 49. Ahlquist, Mr. Johnson, and Mr. Milne all signed the agreement.
¶ 5 The City of Chelan rejected the easement. It required a dedicated right-of-way before it would approve the development. Mr. Johnson drafted a right-of-way and presented it to Ahlquist. But he again left off the words "or its lounge" when addressing protection for the view from the restaurant building. CP at 640 (I FF 1.23); Ex. 40 ¶ 8. Ahlquist refused to sign the document, in part because of Mr. Johnson's failure to provide protection of the view from the downstairs lounge. Ahlquist added back in the "or its lounge" language and the parties then signed the right-of-way agreement on October 23, 1995. The right-of-way agreement incorporated all of the previous terms of the easement agreement. Mr. Johnson signed the agreement granting the right-of-way both individually and in his capacity as president of Key Development.
¶ 6 Key Development then purchased the orchard property on March 2, 1996. The right-of-way was deeded to Key Development on April 23, 1996. The parties understood that the right-of-way agreement was to be recorded with the plat, but it never was. The preamble to the right-of-way agreement provided that a homeowners association would protect Ahlquist's rights: "The Corporation shall require the establishment of a Homeowners Association which shall be responsible for all obligations owed to the Owners [Ahlquist] as set forth herein, except for the continuing obligations (joint and several) of JACK A. JOHNSON." Ex. 3 at 1-2; CP at 643 (I FF 1.43). Mr. Johnson then incorporated the Key Bay Homeowners Association and appointed himself president. He remained president and head of the Association's architectural control committee from 1996 until at least Memorial Day 2002.
¶ 7 Mr. Johnson had hired John Walcker to develop the property. He directed Mr. Walcker to draft restrictive covenants for the Homeowners Association. But Mr. Johnson did not give Mr. Walcker a copy of either the easement agreement or the right-of-way agreement. Mr. Walcker prepared covenants in late 1995. He hired landscape architect Mike Gottschalk to establish maximum roof elevations for the homes in the Key Bay development. Mr. Walcker instructed Mr. Gottschalk that the maximum elevations could be drafted to protect only the views from the upper level of the restaurant, and need not protect the views from the lower level lounge. So Mr. Walcker thought that the view from upstairs was all he had to worry about based on Mr. Johnson's instructions.
¶ 8 The Key Bay Declaration of Restrictive Covenants and the Key Bay Architectural Control Committee Rules, Regulations and Procedures were recorded in September 1996. Paragraph 11 of the committee rules limited all buildings in the development to a single story and a maximum height of 16 feet above the top of the foundation. Mr. Gottschalk, however, established higher maximum roof elevations of up to 26 feet "from *998 elevation point" (from median curb elevation). This is reflected in exhibit "A" to the covenants  a document drafted by Mr. Gottschalk in 1996. CP at 645 (I FF 1.56); RP at 632.
¶ 9 But exhibit "A" was not recorded until September 19, 2000, when Mr. Johnson again recorded the covenants. He was then president of the Homeowners Association and still head of the architectural control committee. Mr. Johnson blamed the title company for not recording exhibit "A" in 1996. He claimed the title company must have misplaced the document. He said he did not realize the problem until 2000. Mr. Johnson recorded covenants a third time on October 2, 2000, raising the maximum height restriction to 35 feet. But he again recorded covenants in March 2002 that returned the maximum height to 26 feet.
¶ 10 Meanwhile, Robert and Roberta Kenagy purchased the restaurant from Ahlquist in 1998. Mr. Kenagy was aware of the right-of-way agreement at the time he purchased the property. Mr. Kenagy was not aware of exhibit "A" to the covenants because it was not included with any documents he received when he purchased the restaurant. He received only the preliminary title report and copies of the easement and right-of-way agreements.
¶ 11 Mr. Kenagy leased the building to his business, Deep Water Brewing, LLC. Deep Water operated the restaurant and lounge as a brew pub from spring 1999 until shortly before he sold the property on September 30, 2005. Sometime before July 2001, Mr. Kenagy learned that property owners in the Key Bay development would be allowed to build multi-story homes. He then sent letters to Mr. Johnson and other lot owners warning that he would enforce the height restrictions set out in the right-of-way agreement.
¶ 12 Michael and Patricia Taylor purchased Lot 5 in the development on April 20, 2002. They were told that the elevation of their house could not exceed 1,164 feet above sea level as stated in exhibit "A," which was attached to the covenants they received. They were also given a "Seller's Property Conditions Report Vacant Land." It represented that there were no disagreements, disputes, or legal actions concerning the property. No one told the Taylors about the Kenagys' claims regarding height restrictions or about the agreements. Ed Ferguson was a real estate broker hired by Mr. Johnson to sell Key Bay lots. Mr. Ferguson told the Taylors that a 26-foot height restriction applied. Mr. Johnson never apprised Mr. Ferguson of the easement and right-of-way agreements.
¶ 13 Proceedings. Deep Water (the Kenagys) sued Fairway Resources, Ltd., Key Development Corporation, the Key Bay Homeowners Association, and Jack Johnson on September 10, 2002, for declaratory judgment and injunctive relief to enforce the provisions in the agreements (easement and right-of-way agreements) that protected their view and to enjoin the defendants from interfering with the restaurant and lounge views. The complaint was later amended to include the Kenagys as plaintiffs and to add claims for damages and attorney fees.
¶ 14 The Taylors submitted building plans for a two-story house to the Homeowners Association architectural control committee. The committee approved their plans on March 17, 2004. The Taylors broke ground in July 2004, after the Kenagys added them as defendants in a second amended complaint for declaratory judgment, injunctive relief, and damages filed on July 14, 2004. The Kenagys filed a third amended complaint in December 2004, adding a claim that Jack Johnson was the alter ego of Key Development Corporation. The court dismissed on summary judgment all contract claims against Mr. Johnson personally. And the Kenagys later abandoned their alter ego claim against Mr. Johnson.
¶ 15 In a fourth amended complaint, the Kenagys claimed breach of contract and entitlement to contractual attorney fees against only Fairway Resources and Key Development, equitable indemnity against only Key Development, and entitlement to damages from all defendants  Fairway Resources, Key Development, the Homeowners Association, and the Taylors.
¶ 16 Liability Phase. The court bifurcated the case into a liability and a damages phase. *999 The liability phase began in March of 2006. The Taylors had completed their home and the Kenagys had sold the restaurant before trial. The case was tried to the court sitting without a jury. At the close of the testimony in the liability phase, the court granted the Kenagys' motion to amend their complaint to add a tortious interference with contract cause of action against the Homeowners Association and Mr. Johnson personally.
¶ 17 Several exhibits admitted during the liability trial show a view toward the lake from the downstairs lounge, before and after the Taylors built their house. Numerous witnesses testified that there was a view of the lake from the downstairs lounge before the Taylors built their house and despite the fact that there was an orchard there. Carolyn Hamshaw worked as a bartender for both Cosina del Lago and Deep Water. She testified that there was a view of the lake from the downstairs lounge and that the Taylors' home blocked part of that view. Patricia Taylor admitted that her house interfered with the view to the lake from the lounge. She testified that she had been in the downstairs lounge, that you can see her house from the lounge, that you cannot see through her house to the lake from the lounge, and that you can see the lake from both floors of her house. The trial judge also visited the site.
¶ 18 Trial Court Holding  Liability. The court found that the Taylors' house interferes with a view of the lake from the downstairs lounge.
¶ 19 The court concluded that there was a valid and enforceable contractual relationship between the Kenagys as Ahlquist's successor in interest and as third party beneficiaries of the easement and right-of-way agreements. The court concluded that Key Development breached the agreements; that Mr. Johnson tortiously interfered with the agreements; and, that because Mr. Johnson acted as the Homeowners Association's agent when doing so, the Association was vicariously liable to the Kenagys. And the court ultimately concluded that Mr. Johnson, the Homeowners Association, and Key Development were jointly and severally liable to the Kenagys. The court also ruled the Taylors were bona fide purchasers without notice and were therefore not liable to the Kenagys.
¶ 20 Damages Phase. The damages phase of the trial started in July of 2007. The Kenagys' expert witness, Dennis Johnson, is a certified real estate appraiser with some 40 years' experience in sales and appraisal of commercial real estate in the Chelan area. The Kenagys gave his report to opposing parties Jack Johnson, Key Development, and Key Bay Homeowners Association on May 10, 2007. Those parties moved to exclude Dennis Johnson's testimony because the property values he used were based on the work of another appraiser, Thomas Walters. They argued, from this, that his expert opinion was then based on hearsay. They also argued that Dennis Johnson could not base his opinion on the work of another appraiser by the rules of professional appraisers. The judge denied their motion.
¶ 21 Dennis Johnson testified that the value of the restaurant had been diminished because its view corridor to the lake was impaired by the Key Bay development. He first enlisted the aid of a licensed professional land surveyor to conduct a view corridor analysis from the downstairs lounge to the lake. The surveyor, Norman Nelson, confirmed that the Taylors' home interferes with the lake view from the lounge based on elevations of the restaurant building's first floor window sill and the top of the Taylors' home. Dennis Johnson concluded that the value of the restaurant building before the view was obstructed was $1.57 million, and the value after was the Kenagys $1.325 million sales price. The $245,000 difference was then the diminution in value caused by the impairment of the view.
¶ 22 Key Development, Jack Johnson, and the Homeowners Association retained certified appraiser Scot Auble shortly before trial and then moved for a continuance to develop their case on damages. The court denied the motion. Mr. Auble criticized Dennis Johnson's methodology as invalid and in violation of the Uniform Standards of Professional Appraisal Practice.[2]
*1000 ¶ 23 Trial Court Holding  Damages. The court accepted Dennis Johnson's conclusions and awarded the Kenagys a judgment of $245,000 jointly and severally against Jack Johnson, Key Development, and the Homeowners Association.
¶ 24 Attorney Fees. The court concluded that the attorney fees and costs provisions of the easement and right-of-way agreements were expansive enough to include all parties to the case, including the Kenagys as third party beneficiaries. The court also concluded that the central issue in the dispute was the nature and extent of the view protected by the easement and right-of-way agreements and the damages that followed the breach of those agreements. The court entered findings of fact and conclusions of law awarding the Kenagys attorney fees of $243,000 and costs of $35,000 jointly and severally against Key Development, Jack Johnson, and the Homeowners Association based upon contract (the agreements) and as prevailing party under RCW 4.84.330 (prevailing party entitled to attorney fees if contract provides for fees for either party). The court also concluded that Mr. Johnson and therefore the Homeowners Association were jointly and severally liable for the Kenagys' fees and costs under the doctrine of equitable indemnity because Mr. Johnson's conduct was the only reason the Kenagys sued any of the defendants. The court denied the Taylors' request for contract-based fees as prevailing party against the Kenagys.
¶ 25 Jack Johnson, Key Development, and the Key Bay Homeowners Association all appeal the liability determination, the damages, and the attorney fees and costs award. The Taylors also appeal the court's denial of their attorney fees award against the Kenagys.

I.

LIABILITY
¶ 26 ISSUE ONE: Did the trial court err in concluding that the agreements were mutually negotiated?
¶ 27 Key Development, Jack Johnson, and Key Bay Homeowners Association first contend that the trial court erred when it concluded that the easement and right-of-way agreements were mutually negotiated. They urge that Ahlquist's counsel drafted both agreements and therefore any inconsistencies or ambiguities must be construed against the Kenagys.
¶ 28 Mr. Milne (Fairway Resources) approached Ahlquist first to secure an easement across Ahlquist's property. Mr. Johnson drafted and presented Ahlquist with an easement agreement that Mr. Johnson had signed in early May 1994. Ahlquist refused to sign. Ahlquist then directed their attorney to insert language that would protect the view for the upstairs restaurant and downstairs lounge. Their attorney did so.
¶ 29 The City of Chelan required a dedicated right-of-way. Jack Johnson then prepared a draft agreement that contained all of paragraph 11 from the easement agreement, except for the final three words, "or its lounge." CP at 640 (I FF 1.23); Ex. 40 ¶ 8. Ahlquist faxed the document to his attorney. The attorney caught Jack Johnson's omission of the downstairs lounge from the agreement. He added protection for the view back into the agreement. CP at 640 (I FF 1.25); RP at 135-36. Ahlquist's lawyer drafted the right-of-way agreement executed on October 23, 1995. RP at 49; Ex. 3.
¶ 30 Appellants Key Development, Jack Johnson, and the Homeowners Association challenge several of the court's findings of fact to the effect that the agreements were mutually negotiated (I FF 1.24, 1.27, 1.38, and 1.39). First, the findings are easily supported by this record. And other unchallenged findings and evidence show that each party had the opportunity to negotiate the documents and make changes to material terms (particularly that language that assured preservation of the view) before signing the final documents. The court's conclusion that the agreements were the result of mutual negotiation is supported by the findings. And the necessary findings are supported by the record.
*1001 ¶ 31 ISSUE TWO: Did the court err when it concluded that there was a breach of the agreements to protect the view from the lower level lounge of the restaurant building?
¶ 32 Key Development, Jack Johnson, and the Homeowners Association next assign error to the trial court's conclusion that Key Development impeded the traditional view from the restaurant. They note that neither Ahlquist nor their attorney specified or quantified the exact view to be protected. And this, they argue, is particularly troublesome because the parties knew that the orchard would be leveled and homes would be built. They challenge the trial court's conclusion that the agreements contemplated the same view both pre-and post-development as both unreasonable and impractical.
¶ 33 Our object here is to determine the intent of the parties. To do so, we first read those provisions protecting the view together with the contract as a whole and in the light of all the circumstances surrounding the contract. Henry v. Lind, 76 Wash.2d 199, 455 P.2d 927 (1969). We, like the trial court, consider both the subject matter and the objective of the agreement, the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of their respective interpretations. See Berg v. Hudesman, 115 Wash.2d 657, 667-69, 801 P.2d 222 (1990); Stender v. Twin City Foods, Inc., 82 Wash.2d 250, 254, 510 P.2d 221 (1973).
¶ 34 For Ahlquist, including the lounge view protection was an essential term of any agreement  a "deal breaker." RP at 135. Mr. Johnson tried to avoid protecting the view from the lounge. But the right-of-way agreement ultimately includes language that does protect the view from the lounge. It also required Key Development to "establish[] a Homeowners Association which shall be responsible for all obligations owed to the Owners [Ahlquist] as set forth herein." Ex. 3 at 1-2; CP at 643 (I FF 1.43).
¶ 35 Mr. Johnson incorporated the Key Bay Homeowners Association. He then directed Mr. Walcker to draft restrictive covenants. Mr. Walcker prepared the covenants that limited all buildings in the subdivision to a single story 16-foot height. The covenants were recorded in September 1996. Mr. Gottschalk, however, set higher maximum roof elevations (up to 26 feet "from elevation point" from median curb elevation). This is reflected in exhibit "A" to the covenants  a document drafted by Mr. Gottschalk. CP at 645 (I FF 1.56); RP at 632. The 16-foot height restriction satisfied the limitations set out in the easement and right-of-way agreements; the heights permitted by exhibit "A" do not.
¶ 36 The agreements' description of exactly what views were to be protected is not a model of clarity. But the conduct of the parties following the agreements is consistent with an intent to limit building heights in the Key Bay development to 16 feet so as not to interfere with any view of the lake from the restaurant or the lounge. A 16-foot elevation standard was ascertainable and a reasonable measure to protect the views from both floors of the restaurant and that is what was first specified in the development covenants.
¶ 37 Appellants Key Development, Jack Johnson, and the Homeowners Association point to testimony by Mr. Ahlquist that he saw no construction in the Key Bay development that he would have considered a breach of the agreements. But Mr. Ahlquist by his own admission was "never down there to notice it" because he met with Mr. Kenagy in an office that had no windows. RP at 167. These appellants also point to Jack Johnson's testimony that before the 1994 easement agreement, Ahlquist saw proposed building elevations for the Key Bay development in two documents (exhibits 51 and 52) that were essentially the same as exhibit "A" to the covenants, and Ahlquist voiced no objection. But Mr. Ahlquist explained he was relying on Mr. Johnson's word that the height restrictions shown would not affect the view from the lounge. Mr. Ahlquist's intent all along was that the downstairs view be protected and he believed that is what Mr. Johnson and Key Development promised to do. He considered "maintaining the views" to be "gospel." RP at 171. Exhibits 51 and 52 set out elevations expressed in terms above sea level. They would have permitted buildings in *1002 the development that would have interfered with views from the lounge. RP at 171. But no one suggested incorporating those exhibits into the agreements.
¶ 38 Appellants Key Development, Jack Johnson, and the Homeowners Association also rely on their own actions after the 1996 covenants were recorded to show the agreements lacked ascertainable view protection standards consistent with a 16-foot height. Br. of Appellants (Key Development and Jack Johnson) at 12-13; Br. of Appellant (Key Bay Homeowners Association and the Taylors) at 15. But, for us, these actions show a breach of the agreements, not confusion over the intent of these parties. Berg, 115 Wash.2d at 667-69, 801 P.2d 222; Stender, 82 Wash.2d at 254, 510 P.2d 221.
¶ 39 Mr. Walcker prepared the first recorded covenants. He then hired Mr. Gottschalk, the landscape architect, to establish maximum roof elevations for the homes in the development. Mr. Walcker instructed him that the maximum elevations were to protect only the views of Lake Chelan from the upstairs of the restaurant building. This was consistent with Mr. Johnson's instructions to Mr. Walcker that the view from the upstairs restaurant was all he had to worry about. Mr. Gottschalk then set maximum roof elevations of 26 feet (exhibit "A" to the covenants).
¶ 40 Exhibit "A" was not recorded, however, until September 19, 2000, when Mr. Johnson (still president of the Homeowners Association and head of its architectural control committee) again recorded the covenants. Mr. Johnson insisted that exhibit "A" was part of the covenants all along and that he never realized until 2000 that it had not been recorded in 1996. He blamed this on title company error. He also said he believed the Homeowners Association had complied with all of the terms of the agreements. But the court did not find him credible; and the record supports the court's finding.
¶ 41 The question before us is whether the trial judge's findings are supported by the evidence; not whether the trial judge could have made other findings suggested by Key Development, Jack Johnson, and the Homeowners Association. In re Marriage of Burrill, 113 Wash.App. 863, 868, 56 P.3d 993 (2002). Ultimately, we agree with the trial court's reading of the agreements. These parties intended to protect the view of the lake from both the restaurant and the lounge. The homes in Key Bay development that exceeded 16 feet interfered with that view. Berg, 115 Wash.2d at 667-69, 801 P.2d 222; Stender, 82 Wash.2d at 254, 510 P.2d 221.
¶ 42 ISSUE THREE: Whether substantial evidence supports the court's findings that the lake view from the lounge protected by the agreements (and 1996 covenants) was obstructed by the Taylors' house?
¶ 43 In a related issue, Key Development, Jack Johnson, and Key Bay Homeowners Association argue that the court's finding that the view is impeded by the Taylors' house is not supported by the record. Our reading of this record suggests otherwise. There is ample evidence that there was a view of the lake from the downstairs lounge before the Taylors' house, despite the orchard. The view changed with the seasons depending on whether the apple trees were leafed out. There was, nonetheless, some view year round. Ms. Hamshaw worked as a bartender for both Cosina del Lago and Deep Water. She confirmed that there was a view to the lake from the downstairs lounge and that the Taylors' home blocked part of that view. Patricia Taylor admitted that her house interfered with the view to the lake from the lounge. She testified that she had been in the downstairs lounge, that you can see her house from the lounge, that you cannot see through her house to the lake from the lounge, and that you can see the lake from both floors of her house.
¶ 44 Surveyor Norman Nelson's opinion on the view corridor also supports the court's finding that the Taylors' house impedes the view. He obtained elevations of various structures including the Taylors' rooftop and the window sill on the first floor of the restaurant building. He concluded that the Taylors' roof impedes the lower floor view corridor and, in fact, even obstructs the view from the second floor.
*1003 ¶ 45 In sum, both the photographs admitted at trial and the testimony support the court's findings that the Taylors' house interferes with a view of the lake from the downstairs lounge.
¶ 46 ISSUE FOUR: Were the covenants, memorialized in the easement and right-of-way agreements, extinguished by merger into either the recorded deed to the Kenagys, or the right-of-way?
¶ 47 The Homeowners Association next argues that any covenant rights merged with the deed and cannot now be enforced by the Kenagys. Black v. Evergreen Land Developers, Inc., 75 Wash.2d 241, 450 P.2d 470 (1969). The court therefore erred in concluding that the Kenagys acquired any rights to the agreements, and in concluding that there was no merger when the right-of-way deed was recorded. The Homeowners Association also notes that the Kenagys introduced no evidence that any "rights" were assigned to them. And the Homeowners Association argues there is no showing that the parties to these agreements intended to either provide for assignments/transfers of the rights or bind successors and assigns. And it then urges that the court also erred in concluding that the Kenagys were third party beneficiaries to the agreements. The Homeowners Association's position, then, is it can have no liability for tortiously interfering with a contract that the Kenagys could not have enforced in the first place.
¶ 48 The general rule is that provisions of a real estate purchase and sale agreement merge into the deed. Id. at 248, 450 P.2d 470; Barber v. Peringer, 75 Wash. App. 248, 251-52, 877 P.2d 223 (1994). There are, however, exceptions. Collateral contract requirements not contained in or performed by execution and delivery of the deed and not inconsistent with the deed are independent obligations that do not merge. Barber, 75 Wash.App. at 251-52, 877 P.2d 223. Whether the terms of a purchase and sale agreement merge depends again on the intent of the parties: "where the intent of the parties is not clearly expressed in a deed, courts may consider parol evidence. In order to determine the intent of the parties, extrinsic evidence is admissible as to the entire circumstances under which a contract is made." Harris v. Ski Park Farms, Inc., 120 Wash.2d 727, 742, 844 P.2d 1006 (1993) (footnote omitted); Failes v. Lichten, 109 Wash.App. 550, 554, 37 P.3d 301 (2001).
¶ 49 The Homeowners Association assigns error to the court's I Conclusion of Law 2.12:
[T]he merger doctrine does not preclude this action since the deed from Smith and Ahlquist to Key Development was only for the roadway and not the land that should have been encumbered by covenants running with the land and it does not apply in [the] transaction between Smith and Ahlquist and Kenagy because Key Development and Johnson are not parties to that transaction.
CP at 653.
¶ 50 The Kenagys argue that the Homeowners Association has no standing to assert the merger doctrine because it was not a party to the purchase and sale agreement. They rely on a statement in Brown v. Johnson reiterating the basic principle that merger, in this context, recognizes the right to change the terms of a contract at any time prior to performance. Brown v. Johnson, 109 Wash.App. 56, 59, 34 P.3d 1233 (2001). Brown does not stand for the proposition that parties not privy to a contract but who later become embroiled in a dispute stemming from the contract cannot assert merger. And the Kenagys cite no case law for this proposition. We reject their argument.
¶ 51 In any event, the Kenagys primarily rely on the oral covenant exception to merger discussed in Black:
We do not find that the oral covenant not to impair the view of the east channel is inconsistent with the deed; nor do we find that there was any intention on the part of either party to surrender this covenant by merger  the evidence is entirely to the contrary. Both the admissions and the actions of the defendants demonstrate that the oral covenant did in fact exist, was an inducement to enter the contract, and was foremost in the minds of all the parties *1004 subsequent to the execution of the deed of conveyance.
Black, 75 Wash.2d at 249, 450 P.2d 470.
¶ 52 The deed to the Kenagys says nothing about protecting the views of the lake. But the real estate purchase and sale agreement, quoted in the court's I Finding of Fact 1.8, provides that:
All representations, warranties and covenants of Seller contained herein shall survive the Closing and shall inure to the benefit of Buyer and its legal representatives, heirs, successors or assigns.
CP at 638; Ex. 29, at 4. And exhibit A attached to the purchase and sale agreement, also quoted in I Finding of Fact 1.8, provides that: "All rights of the sellers or running with the land with respect to the Key Bay Development adjacent to the premises shall be included." CP at 638; Ex. 29, at 9.
¶ 53 Whether these agreements to preserve the view from the restaurant and lounge merged with the deed or instead survived is a mixed question of fact and law. It depends on the intent of the parties to the agreement. Failes, 109 Wash.App. at 554, 37 P.3d 301.
¶ 54 Ahlquist absolutely believed that the Kenagys would have the same lounge view protections that were set forth in the agreements. Mr. Kenagy knew of the agreements and that the building height restrictions were one of the conditions for purchasing the property. And Mr. Kenagy later attempted to enforce the height restrictions despite Jack Johnson's assertions they only benefited Cosina del Lago and were null and void after the building was sold to the Kenagys.
¶ 55 This uncontroverted evidence establishes that the parties intended that the Kenagys' right to the view would survive any merger of the real estate contract and deed. And this is reflected in the court's I Finding of Fact 1.8:
Exhibit A to the Purchase and Sale Agreement contains a provision that: "Other: All rights of the sellers or running with the land with respect to the Key Bay Development adjacent to the premises shall be included." In addition, Paragraph 12.1(F) of the Purchase and Sale Agreement (Trial Exhibit 10) states: ... All ... covenants of Seller contained herein shall survive the Closing and shall inure to the benefit of Buyer and its legal representatives, heirs, successors, or assigns.
CP at 638 (emphasis omitted). This finding supports our legal conclusion that the covenants assuring preservation of a view from the restaurant and lounge survived the deed conveying the property to the Kenagys. Black, 75 Wash.2d at 249, 450 P.2d 470.
¶ 56 The Homeowners Association also asserts that the court should have found there was a merger when the right-of-way deed was recorded on April 22, 1996, because "there was no language relating to or reserving the so-called view rights." Br. of Appellant (Key Bay Homeowners Association) at 17. But the Homeowners Association does not develop this argument. We then decline to further address this issue.
¶ 57 ISSUE FIVE: Are the Kenagys third party beneficiaries or otherwise entitled to the benefit of the covenants set out in the agreements, as successors to Ahlquist's interests?
¶ 58 Key Bay Homeowners Association next challenges the trial court's I Conclusion of Law 2.2 that Kenagys are third party beneficiaries to the agreements. The Homeowners Association argues first that nothing in these agreements expresses any intent that some third party benefit from the covenants guaranteeing a view of the lake. It argues that a third party beneficiary must be expressly identified by the contracting parties and that was not done here. And, second, it argues that the agreements do not show any intent to bind successors or to create covenants that would run with the land. Again, under these theories, the Kenagys could not prevail on the claim for tortious interference with a contract they cannot enforce.
¶ 59 Here is part of the court's oral ruling on this:
The Court also concludes the agreements, themselves, the Right-of-Way Agreement and the Easement Agreement, are not covenants running with the land. Rather, Key Development breached its *1005 promise to provide those covenants running with the land, which the Kenagys and Deep Water [Brewing] were third-party beneficiaries of that contract.
RP (June 23, 2006) at 8.

Third Party Beneficiary
¶ 60 The creation of a third party beneficiary agreement requires that the parties intend, at the time they enter into the agreement, that the promisor assume a direct obligation to the beneficiary. Lonsdale v. Chesterfield, 99 Wash.2d 353, 361, 662 P.2d 385 (1983). "`If the terms of the contract necessarily require the promisor to confer a benefit upon a third person, then the contract, and hence the parties thereto, contemplate a benefit to the third person.'" Id. (emphasis omitted) (quoting Vikingstad v. Baggott, 46 Wash.2d 494, 496, 282 P.2d 824 (1955)). The test for intent is an objective one  whether performance under the contract would necessarily and directly benefit that party. Id. "The contracting parties' intent is determined by construing the terms of the contract as a whole, in light of the circumstances under which it is made." Postlewait Constr., Inc. v. Great Am. Ins. Cos., 106 Wash.2d 96, 99-100, 720 P.2d 805 (1986).
¶ 61 There is, of course, no mention of benefiting the Kenagys or any other third party, for that matter, in either the easement or the right-of-way agreement. The Kenagys are not third party beneficiaries to these agreements. Indeed, we find no attempt to assign the benefits of these agreements to the Kenagys. Exhibit 11, which purports to assign the rights under the agreements to Deep Water Brewing, was never offered or admitted into evidence.
¶ 62 The Kenagys are not third party beneficiaries as defined in Lonsdale to either the easement or the right-of-way agreements. Lonsdale, 99 Wash.2d at 361, 662 P.2d 385.

Running Real Covenants
¶ 63 The question whether these agreements were to run with the land  running real covenants  is more difficult. The trial court's theory appears to be that the 1996 recorded covenants, those that complied with the agreements, would be "running covenants" had Key Development and Jack Johnson not breached by recording non-complying covenants (exhibit "A") in 2000. This, according to the trial court, conferred the status of third party beneficiaries on the Kenagys, as Ahlquist's successor. The parties argued in the trial court over whether these agreements created running covenants that were enforceable by the Kenagys. CP at 862-69, 891-93, 957-65. The gist of the Kenagys' argument was that there is no reason why they should not have the enforcement status of third party beneficiaries since the running covenant intent was present. CP at 965. The court's oral ruling reflects this reasoning. RP (June 23, 2006) at 8. The written conclusions do not, however, address the elements of running covenants.
¶ 64 We nevertheless can and will decide the case on any legal theory established by the pleadings and supported by the proof, regardless of the theory applied below. Barber, 75 Wash.App. at 254, 877 P.2d 223. Whether the evidence and findings here support the elements necessary to establish a running real covenant is a question of law that we will decide de novo. See, e.g., Stokes v. Kummer, 85 Wash.App. 682, 689-90, 936 P.2d 4 (1997).
¶ 65 The elements of a running real covenant are:
(1) the covenants must have been enforceable between the original parties, such enforceability being a question of contract law except insofar as the covenant must satisfy the statute of frauds; (2) the covenant must "touch and concern" both the land to be benefitted and the land to be burdened; (3) the covenanting parties must have intended to bind their successors in interest; (4) there must be vertical privity of estate, i.e., privity between the original parties to the covenant and the present disputants; and (5) there must be horizontal privity of estate, or privity between the original parties.
Leighton v. Leonard, 22 Wash.App. 136, 139, 589 P.2d 279 (1978) (footnote omitted) (citing William B. Stoebuck, Running Covenants: *1006 An Analytical Primer, 52 WASH. L.REV. 861 (1977)).
¶ 66 Professor Stoebuck explains in Washington Practice: Real Estate: Property Law:
Enforcement between the original parties is a matter of the law of contract. ... But the doctrine with which we are concerned here is the doctrine, generally regarded as part of the law of real property, under which the covenant by the original parties may be enforced by or against persons who succeed to interests they held in the burdened or benefited land. The doctrine of "running" is analogous to the contract doctrines of assignment of rights and delegation of duties; it is a doctrine whereby remote parties are bound or benefited by contractual covenants made by the original parties. However, while a party must consensually undertake assignment or delegation, the law of running covenants imposes a duty or confers a benefit upon remote parties, not because they consensually agree, but because the covenant bore a certain relationship to parcels of land and because they stepped into a certain relationship with the same parcels. The essence of the law of running covenants has to do with what these relationships must be for the remote parties to be bound or benefited.
17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 3.2, at 126 (2d ed.2004) (emphasis added).
¶ 67 Here, the first Leighton element is met. The agreements between Ahlquist, Key Development, and Jack Johnson required protection of a view by covenants restricting heights. It was a condition of the right-of-way being granted. And Key Development acknowledged as much and met that obligation when it first recorded covenants that restricted the height of buildings in its development to 16 feet.
¶ 68 The trial judge also concluded that the parties knew what land was benefited by and what land was burdened with the restriction despite the absence of a formal legal description. The street address of the restaurant building was included in the easement agreement. That conclusion is not challenged here on appeal.
¶ 69 The second element required by Leighton requires a showing that the burden touches and concerns the land, or more accurately the benefit and burden must "touch and concern" estates in the land with which they run. 17 STOEBUCK & WEAVER, supra, § 3.3, at 131. A covenant touches and concerns the land if it is connected with the use and enjoyment of the land. Rodruck v. Sand Point Maint. Comm'n, 48 Wash.2d 565, 574-76, 295 P.2d 714 (1956) (promise to pay assessment for maintenance was a running covenant). The covenant must be so related to the land as to enhance its value and confer a benefit upon it. Id. at 575, 295 P.2d 714; see also City of Seattle v. Fender, 42 Wash.2d 213, 218, 254 P.2d 470 (1953). A covenant touches and concerns the land when, by restricting the use of one parcel, it enhances the value of another. Mountain Park Homeowners Ass'n v. Tydings, 72 Wash.App. 139, 145, 864 P.2d 392 (1993), aff'd, 125 Wash.2d 337, 883 P.2d 1383 (1994); see also 17 STOEBUCK & WEAVER, supra, § 3.3, at 136. A promise to do or refrain from doing a physical act upon the land, such as restricting the height, size, or location of structures is an example of a covenant that touches and concerns the land. See 17 STOEBUCK & WEAVER, supra, § 3.3, at 132 (citing Leighton, 22 Wash.App. 136, 589 P.2d 279).
¶ 70 Here, the 16-foot height restriction in the 1996 covenants would have made Key Development lots, such as the Taylors and others, less desirable. And the height restrictions would have enhanced the value of the restaurant and lounge by protecting the view. The view was critical to the restaurant owners. RP at 58, 134-35, 168-70, 301, 440-41. We conclude, then, that the restriction here touched and concerned land. Rodruck, 48 Wash.2d at 575, 295 P.2d 714; Tydings, 72 Wash.App. at 145, 864 P.2d 392.
¶ 71 The third Leighton element is intent to bind successors in interest. And generally that would require some expression of intent to assign or bind successors but:

*1007 No American decision has been found in which a court has held that the word "assigns" must be used. The most that can be said, from the little American authority on the point, is that, in some general way, there must be an intent that a running covenant bind successors. Intent may be drawn from all the language, including the nature of the covenant. In fact, it seems if a covenant is found to touch and concern, this alone may often be enough to show an intent that it should bind successors. When that is the case, of course, intent is subsumed in touch and concern and loses significance as an independent element.
17 STOEBUCK & WEAVER, supra, § 3.4, at 137; see also I WASH. STATE BAR ASS'N, WASHINGTON REAL PROPERTY DESKBOOK § 14.2(2)(d), at 14-14 (3d ed.1997).
¶ 72 The covenant here touched and concerned land, and we conclude it therefore reached beyond those obligations that are generally limited to the contracting parties only. To conclude otherwise would mean that the parties to these agreements intended that the view of the lake was to be preserved only so long as Ahlquist owned the building. The import of the agreements is otherwise. Indeed, the right-of-way agreement required Key Development to establish the Homeowners Association to implement the agreements and through that Association to assure compliance with the negotiated height restrictions. This included creating covenants to ensure compliance with those provisions of the agreements that there "shall not be any homes or structures in the development that interfere with the view of the lake from the restaurant or its lounge." Ex. 2 ¶ 11; Ex. 3 ¶ 11. Key Development through its Homeowners Association recorded complying covenants in 1996 and thereby gave notice to the world of the contents of the covenants. Strong v. Clark, 56 Wash.2d 230, 232, 352 P.2d 183 (1960). The evidence then supports I Finding of Fact 1.29 that the parties "intended to require that there shall not be any homes or structures in the Key Bay Development that interfere or affect the sight or views of Lake Chelan from any portion of either the upstairs or the downstairs of the Premises." CP at 641.
¶ 73 Moreover, the very existence of the Key Bay development is due, in part, to Ahlquist's grant of a right-of-way subject to view protections that would burden Key Bay lots with the height restrictions. The intent then to confer a benefit to one property and impose a burden on another is clear. We conclude that both parties to the original agreements intended for the covenants to benefit and bind successors in interest.
¶ 74 Finally, requirements for both vertical and horizontal privity are met here. Vertical privity requires that the original parties' successors be in privity with them. The Kenagys purchased from Ahlquist. And Key Development was an original party to both the agreements. Horizontal privity requires "the transfer of some interest in land, other than the covenant itself, between covenantor and covenantee in connection with the making of the covenant." 17 STOEBUCK & WEAVER, supra, § 3.6, at 138; see Bremmeyer Excavating, Inc. v. McKenna, 44 Wash.App. 267, 721 P.2d 567 (1986) (disputed contract to provide fill material did not pass in conjunction with estate in land); Feider v. Feider, 40 Wash.App. 589, 593, 699 P.2d 801 (1985) (no horizontal privity because personal right of first refusal did not pass with estate in land). Here, the height restriction was made as a requirement of the agreements and ultimately in the right-of-way deeded to Key Development and for Key Development's benefit.
¶ 75 In sum, Key Development recorded a covenant in 1996 to restrict the heights of structures to 16 feet. This was intended as a running covenant  to benefit successor estate-in-land holders like the Kenagys. And it would have done so but for Key Development's breach of those agreements by later recording noncomplying covenants that allowed lot owners to build multi-story buildings. Ahlquist could have enforced the original covenants. We conclude, then, that the Kenagys can also enforce the 1996 height restriction covenant.
¶ 76 Our analysis here comports with I Conclusions of Law 2.6 and 2.12 that Key Development breached its promise to provide restrictive covenants that would run with the land for the Kenagys' benefit and that Key *1008 Development's land should have been so encumbered. All of the elements necessary for a running covenant have been satisfied here.
¶ 77 ISSUE SIX: Did the trial court err in ruling that Jack Johnson is personally liable for tortious interference with the agreements?
¶ 78 Tortious interference with contractual relations or business expectancy requires a showing of:
"1. The existence of a valid contractual relationship or business expectancy;
2. That defendants had knowledge of that relationship;
3. An intentional interference inducing or causing a breach or termination of the relationship or expectancy;
4. That defendants interfered for an improper purpose or used improper means; and
5. Resultant damages."
Commodore v. Univ. Mech. Contractors, Inc., 120 Wash.2d 120, 137, 839 P.2d 314 (1992) (quoting Sintra, Inc. v. City of Seattle, 119 Wash.2d 1, 28, 829 P.2d 765 (1992)). "Once these elements are established, the defendant bears the burden of justifying the interference or showing that the actions were privileged." Id.; Pleas v. City of Seattle, 112 Wash.2d 794, 800, 804, 774 P.2d 1158 (1989).
¶ 79 Jack Johnson contends that the trial court could not have concluded that he tortiously interfered with a contract (the easement and right-of-way agreements) by the court's own findings of fact. The trial court found that Mr. Johnson's misrepresentations to Ahlquist that resulted in the breach were done to benefit Key Development and not purely for his personal benefit. He was a corporate officer. Mr. Johnson then argues, on authority of Olympic Fish, that his actions were by definition in good faith. Olympic Fish Prods., Inc. v. Lloyd, 93 Wash.2d 596, 599, 611 P.2d 737 (1980) (actions done on behalf of a corporate principle are actions done in good faith).
¶ 80 Mechanical application of the Olympic Fish case is complicated by the fact that Mr. Johnson was Key Development. There was no difference, no separation of interests. No matter what Mr. Johnson's motives or conduct, he benefited by the enhanced value of the lots he was trying to sell. And the Kenagys so argue. Br. of Resp't (Robert and Roberta Kenagy) at 41.
¶ 81 Olympic Fish sets out specific standards for imposing liability on a corporate officer for tortious interference with his corporation's contractual relations. There, the court begins with the statement that a party to the contract cannot be liable in tort for inducing its own breach  it is a logical inconsistency. Olympic Fish, 93 Wash.2d at 598, 611 P.2d 737. But the privilege for an agent acting on behalf of a corporation is not absolute, and corporate officer status does not shield the actor as a matter of law from liability for the tort. Id. at 599, 611 P.2d 737. To avoid personal liability, the corporate officer must have acted in good faith, which "in this context means nothing more than an intent to benefit the corporation" as we have noted. Id. The court explained:
Although corporate officers may benefit from a breach of contract, they need not curtail any advice as long as it is given with the intention to serve the best interests of the corporation. The good faith test merely prevents corporate officers from pursuing purely personal goals with no intent to benefit the corporation. In discussing the term "good faith" in this context, the Oregon Supreme Court observed:
So long as the officer or employee acts within the general range of his authority intending to benefit the corporation, the law identifies his actions with the corporation. In such a situation the officer is not liable for interfering with a contract of the corporation any more than the corporation could be liable in tort for interfering with it. The words "good faith" should not be employed to render a corporate officer or employee liable for engaging in morally questionable activities upon behalf of his principal that nevertheless would not be tortious if he were acting for himself as the party to the contract.
*1009 Id. at 600, 611 P.2d 737 (quoting Wampler v. Palmerton, 250 Or. 65, 76-77, 439 P.2d 601 (1968)).
¶ 82 Washington case law applying these principles is sparse. The issue does appear to be treated as a matter of privilege or justification to be raised as an affirmative defense by the defendant. See Pleas, 112 Wash.2d at 804, 774 P.2d 1158. Washington's pattern jury instruction and the related commentary are helpful. The pertinent instruction reads:

(Name of defendant) asserts that [he]... acted to protect a legal right.
If you find that (name of defendant) has proved that [he] ... acted in good faith to protect, by proper means, a legal right of (name of defendant), such as (name of defendant's) [property] [contractual] [(describe other) ] interest, then (name of defendant's) conduct in inducing the breach of contract between (name of plaintiff) and (name of breaching party) was proper.
If you find, however, that (name of defendant) acted merely in pursuit of a potential future advantage, not yet realized, then the interference was improper.
6A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 352.04 (5th ed. 2005) (WPI). The comment to the instruction suggests that the corporate officer's intent is important:
With respect to the interests of the defendant, see Restatement (Second) of Torts § 767, comments d and f (1979), and 45 Am.Jur.2d, "Interference," § 30 (1969). According to Prosser and Keeton on Torts:
The defendant is ... permitted to interfere with another's contractual relations to protect his own present existing economic interests, such as the ownership or condition of property, or a prior contract of his own, or a financial interest in the affairs of the person persuaded. He is not free, under this rule, to induce a contract breach merely to obtain customers or other prospective economic advantage; but he may do so to protect what he perceives to be existing interests....

W. Keeton, Prosser and Keeton on Torts, § 129, at 986 (5th ed.).
WPI cmt., at 436 (emphasis added) (alterations in original). The comment further states:
Washington courts concur that "one who in good faith asserts a legally protected interest of his own that he believes may be impaired by the performance of a contract between others is not guilty of tortious interference." Roy v. Cunningham, 46 Wash.App. 409, 416, 731 P.2d 526 (1986). See also Olympic Fish Products, Inc. v. Lloyd, 93 Wash.2d 596, 611 P.2d 737 (1980) (corporate officer, acting in good faith, i.e., with intent to benefit the corporation, not liable for inducing corporation to violate contract).
Id. at 437 (emphasis added). See also Lincor Contractors, Ltd. v. Hyskell, 39 Wash.App. 317, 323, 692 P.2d 903 (1984) (interference justified as a matter of law only when one interfering exercises absolute right equal or superior to right invaded).
¶ 83 Yes, here the court found that Mr. Johnson acted to benefit Key Development. But it does not follow that he acted in "good faith." And the court certainly did not find that he acted in good faith. Indeed, the court's findings suggest that it concluded that Mr. Johnson did not act in good faith, as that term is traditionally understood. Tyler v. Grange Ins. Ass'n, 3 Wash.App. 167, 173, 473 P.2d 193 (1970) ("When courts speak of liability for bad faith or the duty to use good faith, they are usually referring to the same obligation. Generally speaking in the context of these cases, good faith means being faithful to one's duty or obligation; bad faith means being recreant thereto."); Ross v. Ticor Title Ins. Co., 135 Wash.App. 182, 190, 143 P.3d 885 (2006) ("Every contract carries with it an implied covenant of good faith and fair dealing that obligates the parties to cooperate with one another so that each may obtain the full benefit of performance."), aff'd sub nom. Ross v. Kirner, 162 Wash.2d 493, 172 P.3d 701 (2007).
¶ 84 Jack Johnson ignored those provisions of the easement and right-of-way agreements whether individually or while acting in his capacity as the Homeowners Association president and head of its architectural control *1010 committee. Recording covenants was a responsibility of the Homeowners Association. As a nonparty to the agreements, it could be an intermeddler subject to liability for tortious interference. See Calbom v. Knudtzon, 65 Wash.2d 157, 162, 396 P.2d 148 (1964) (party generally cannot tortiously interfere with its own contract but intermeddling third party can commit tortious interference). And it was in his capacity as a Homeowners Association agent (and not as a Key Development or personal signatory to the agreements) that Mr. Johnson recorded noncomplying covenants to make the lots he wanted to sell more valuable (and to also improve his own fortunes). That advantage (letting lot owners build multi-story homes) was not part of the agreements.
¶ 85 The trial judge did not believe Mr. Johnson's claim that exhibit "A" was meant to be included all along and was not recorded in 1996 due only to title company error. Indeed, Mr. Taylor said he likely would not have purchased his lot under the original 16-foot height restriction. Another Key Bay lot owner, Stuart Fox, also would not have purchased his lot if he could not build a two-story home. We agree then with the court's conclusions that Mr. Johnson acted unreasonably, if not dishonestly, by knowingly and deliberately ignoring the height restriction provisions in the agreements. We conclude further that this is not good faith and moves Mr. Johnson's conduct outside of the protections provided by the definition of good faith set out in Olympic Fish, 93 Wash.2d at 599, 611 P.2d 737.
¶ 86 Mr. Johnson, while acting in his Homeowners Association capacity, was not protecting the legitimate interest of his corporation, Key Development. The interests asserted instead reflected a direct breach of the agreements that made those corporate interests possible in the first place, i.e., Key Bay development's very existence was dependent upon the grant of the right-of-way. The conduct here does not meet the good faith test of Olympic Fish because (under the court's findings) Mr. Johnson knew he was not protecting an existing corporate interest. This absence of good faith places his conduct within the general principle that a corporate officer who knowingly participates in or directs that the acts be done is not shielded from personal liability for a tort committed within the scope of his official duties to the corporation  here, the Homeowners Association. Johnson v. Harrigan-Peach Land Dev. Co., 79 Wash.2d 745, 752-53, 489 P.2d 923 (1971); see also Schwarzmann v. Ass'n of Apartment Owners, 33 Wash.App. 397, 403, 655 P.2d 1177 (1982) (piercing corporate veil only appropriate when officer or director commits or condones a wrongful act in carrying out his duties and a lack of good faith can be shown). We note, again, that Mr. Johnson's personal liability is limited strictly to tort arising from the agreements and only Key Development is liable for breach of contract.
¶ 87 The court's findings support its several conclusions of law that Mr. Johnson is not insulated from personal liability for his tort committed while acting as president of the Homeowners Association and head of its architectural control committee. CP at 654-55 (I Conclusion of Law (CL) 2.15-2.22).
¶ 88 ISSUE SEVEN: Did the court err in ruling that the Homeowners Association is jointly and severally liable for Mr. Johnson's tortious interference with the agreements?
¶ 89 The Homeowners Association notes that neither the easement agreement nor the right-of-way agreement refer to or impose any responsibility on the Association to do anything. And the Homeowners Association argues that the court improperly imposed an obligation by imputing Mr. Johnson's knowledge to the Association. It argues that, even assuming interference by Mr. Johnson or his company, Key Development, there is no showing that any of it was performed on behalf of or at the behest of the Association. Accordingly, the Homeowners Association urges us to conclude that the court erred by imposing liability against it.
¶ 90 The preamble to the right-of-way agreement is that: "The Corporation shall require the establishment of a Homeowners Association which shall be responsible for all obligations owed to the Owners [Ahlquist] as set forth herein, except for the continuing obligations (joint and several) of JACK A. JOHNSON." Ex. 3 at 1-2. And paragraph *1011 11 of the earlier easement agreement remained in effect:
The Corporation warrants and covenants that it shall establish and monitor compliance with all necessary building covenants in its development so as to not affect the sight or views from Cosina del Lago restaurant to the lake. There shall not be any homes or structures in the development that interfere with the view of the lake from the restaurant or its lounge.
Exs. 2, 3.
¶ 91 Mr. Johnson incorporated the Key Bay Homeowners Association. In 1996, it, in turn, issued and recorded the covenants restricting homes to a single-story, 16-foot height. These actions reflect a reasonable interpretation of the agreements that the Homeowners Association was obligated to prevent homes in the development from interfering with the view of the lake from the lounge. See Santos v. Dean, 96 Wash.App. 849, 854, 982 P.2d 632 (1999) (we impute to a person an intention corresponding to the reasonable meaning of his words and acts). The court concluded that: "Had the obligation stated in Paragraph 11 of the First Recorded Covenants been honored, the obligations stated in the Right of Way Agreement and Easement Agreement relative to views would have likewise been met." CP at 645-46 (I FF 1.62).
¶ 92 The question is whether Jack Johnson's tortious actions were properly imputed to the Homeowners Association.
¶ 93 An agency relationship exists, either expressly or impliedly, when one party acts under the direction and control of another. Hewson Constr., Inc. v. Reintree Corp., 101 Wash.2d 819, 823, 685 P.2d 1062 (1984). The burden of establishing an agency relationship rests with the party asserting its existence. Id. Mr. Johnson was a party to both agreements. He formed the Homeowners Association that the agreements required. He appointed himself the Association president and head of the architectural control committee. He was then an agent of the Association. And he was, of course, well aware of the obligations imposed by the agreements.
¶ 94 Generally, a principal is chargeable with notice of facts known to its agent. This follows the duty of an agent to communicate his knowledge to the principal. Hendricks v. Lake, 12 Wash.App. 15, 22, 528 P.2d 491 (1974); see Kelsey Lane Homeowners Ass'n v. Kelsey Lane Co., 125 Wash. App. 227, 235, 103 P.3d 1256 (2005). Thus, a principal may be vicariously liable for the unauthorized conduct of an agent who is acting on the principal's behalf. McGrane v. Cline, 94 Wash.App. 925, 929, 973 P.2d 1092 (1999). But that rule does not apply when the corporate officer's knowledge or notice is acquired outside the scope of his powers or duties, or when he is not acting for or on behalf of the corporation. Hendricks, 12 Wash.App. at 22, 528 P.2d 491. The same exception applies when the corporate officer/agent deals with the principal/corporation in his own interest which is adverse to that of the principal. Id. Similarly, the principal is not liable when the agent steps aside from the principal's purposes in order to pursue a personal objective of the agent. McGrane, 94 Wash.App. at 929, 973 P.2d 1092.
¶ 95 The gist of the Homeowners Association's contention now on appeal is that if Mr. Johnson did commit a tort, he did so only in the interests of Key Development or himself personally. The Association suggests that the liability-creating conduct of relaxing the 16-foot height restrictions to 26 feet was known to Mr. Johnson (or harbored by him) well before the Association was formed and thus cannot be attributable to the Association.
¶ 96 Mr. Johnson did testify that exhibit "A" allowing for multi-story homes was part of the covenants in the first instance and should have been recorded in 1996. The court did not believe Mr. Johnson's claim that the title company was to blame for not recording exhibit "A." Either way, he admittedly knew about the relaxed height restrictions before the Homeowners Association was formed. He was president of the Association and acted in that capacity in 2000, when he again recorded covenants that impaired the view from the lower level lounge  a view he had hoped not to have to protect in the first place. We will, then, *1012 impute his knowledge of the change in height restrictions to the Association. His failures to apprise the successor Homeowners Association presidents or prospective lot purchasers of the agreements were failures of his obligations as the Association president. Indeed one central purpose for creation of the Association, at least for the owners of the restaurant and lounge, was to enforce the restrictions to preserve the view. All of this is reflected in the court's findings of fact. See CP at 646, 648 (I FF 1.65, 1.66, 1.78); RP at 276-77.
¶ 97 Key Bay Homeowners Association further argues that Mr. Johnson acted outside the scope of his capacity as the Association's president. And the trial court then improperly imputed his knowledge to the Association. The Association then posits that there is no evidence Mr. Johnson was aware of any breach. He testified that he believed he had fully complied with his obligations as president when he turned over those duties. As we have concluded, Mr. Johnson tortiously interfered with the agreements and he did so also in his capacity as the Association's president.
¶ 98 The fact that Mr. Johnson did not sign the agreements or that no one signed the agreements on behalf of the Association is not relevant. He committed to limiting height of houses in the development in furtherance of covenants that we have concluded run with the land. He committed to forming a homeowners association to effect those restrictions, again in furtherance of those covenants. And he did so. But then later, after creation of Key Bay Homeowners Association, he breached those agreements by changing the covenants. Finally, the court did not find Mr. Johnson credible; he acted disingenuously and knew he was facilitating a breach.
¶ 99 The Homeowners Association then, through its agent Mr. Johnson, failed in its duty to evaluate building plans for compliance with the covenants. It instead allowed lot owners, including the Taylors, to build in violation of the agreements and thereby impair the view from the lounge. The Homeowners Association is, then, subject to joint and several liability. Riss v. Angel, 131 Wash.2d 612, 628-30, 934 P.2d 669 (1997).
¶ 100 We affirm the trial court's imposition of joint and several liability against Key Development, Jack Johnson, and Key Bay Homeowners Association.

II.

DAMAGES
¶ 101 ISSUE EIGHT: Did the court err in allowing the Kenagys' damages expert, Dennis Johnson, to give opinions on the diminution of the restaurant building's value, based on the work of another appraiser?
¶ 102 Appellants Key Development, Jack Johnson, and Key Bay Homeowners Association next contend that the court should not have allowed the Kenagys' expert, Dennis Johnson, to express opinions on the damages occasioned by any loss of view. They argue that he based his opinion, in part, on the valuation of another appraiser, Thomas Walters. They argue that this was inadmissible hearsay, that it was not Dennis Johnson's expert opinion but that of Mr. Walters, and that the opinion violated various administrative regulations that govern real estate appraisals.
¶ 103 First, a trial judge's decision to admit expert testimony is discretionary. We will not, then, disturb those rulings absent some abuse of that discretion. E.g., Weyerhaeuser Co. v. Commercial Union Ins. Co., 142 Wash.2d 654, 683, 15 P.3d 115 (2000). Expert testimony is admissible if the witness's expertise is supported by the evidence, his opinion is based on material reasonably relied on in his professional community, and his testimony is helpful to the trier of fact. Reese v. Stroh, 128 Wash.2d 300, 306, 907 P.2d 282 (1995); ER 702; ER 703.
¶ 104 Dennis Johnson is a licensed general certified appraiser with 40 years of experience appraising properties in the Chelan area. He was familiar with the restaurant building. He owned a neighboring condominium and watched the restaurant being built in 1984. He was a customer of the downstairs lounge on perhaps 12 occasions *1013 and recalled there was always a view of the lake, despite the presence of the orchard.
¶ 105 The first question here is whether Dennis Johnson's opinion should be characterized as an "appraisal" that, according to appellants Key Development, Jack Johnson, and the Homeowners Association is invalid and inadmissible because it failed to meet the Uniform Standards of Professional Appraisal Practice (USPAP). The standards of practice applicable to appraisers such as Mr. Johnson are adopted in WAC 308-125-200(1).
¶ 106 The USPAP defines "Appraisal" as "the act or process of developing an opinion of value." USPAP at 1. "Appraisal Consulting" is "the act or process of developing an analysis, recommendation, or opinion to solve a problem, where an opinion of value is a component of the analysis leading to the assignment results." Id. "An appraisal consulting assignment involves an opinion of value but does not have an appraisal or appraisal review as its primary purpose." Id. cmt. to "Appraisal Consulting." Standard 4 requires the person performing the assignment to "identify the problem to be solved, determine the scope of work necessary to solve the problem, and correctly complete the research and analyses necessary to produce credible results." USPAP at 38. In addition, "In some assignments, the opinion of value may originate from a source other than the consulting appraiser." Id. cmt. to Standard 4; see CP at 570 (II CL 2.15).
¶ 107 "An opinion of value or an opinion as to the quality of another appraiser's work cannot be the purpose of an appraisal consulting assignment. Developing an assignment for those purposes is an appraisal or an appraisal review assignment, respectively." USPAP at 38 cmt. to Standard 4. There is nothing in the USPAP that addresses how to evaluate the Kenagys' claim of damage to a view corridor.
¶ 108 Dennis Johnson explained that the purpose of his assignment was not to do an appraisal and that he did not do any appraisal. Rather, his assignment was to establish the loss in value attributable to the impeded view corridor due to some other influence  here, the building of houses in the Key Bay development. He opined that a diminution of value is not an appraisal. He did an analysis based upon an appraisal. And this, he concluded, complied with the applicable USPAP Standard 4.
¶ 109 Dennis Johnson evaluated the loss by a retrospective (or snapshot in time) value of the Kenagys' property before and after the view obstruction. He began with surveyor Norman Nelson's conclusions that the roof lines of two homes in the development (including the Taylors') impeded the lounge view corridor that was to be protected.
¶ 110 He then used Thomas Walters' 1999 independent bank appraisal. Mr. Walters valued the property at $850,000. Dennis Johnson had worked with Mr. Walters for many years and trusted the quality of his work. But he did not accept Mr. Walters' opinion at face value. He independently confirmed that the appraisal met the USPAP and that the value was justified. He confirmed the square footage and verified that the comparable sales used were consistent with what he had personally seen in the local market. He concluded that Mr. Walters' 1999 appraisal was well supported, had all the necessary foundations, and was an accurate starting point for valuation. Indeed, Dennis Johnson testified that it would have been difficult to perform a retrospective appraisal as well as Mr. Walters' appraisal here.
¶ 111 Dennis Johnson opined that it is common practice in the industry to rely on past appraisals that are shown by independent research to be reliable and accurate, and that he did not deviate from that practice here. He said that in a retrospective process, quality work previously done should not be disregarded by an appraiser.
¶ 112 Dennis Johnson added in the Kenagys' $538,656 in capital investments in the property in 1999, after Mr. Walters' appraisal. Mr. Johnson considered this amount reasonable because the building's indoor square footage was increased and it was renovated to "turnkey" condition for the Kenagys' 2005 purchaser.
*1014 ¶ 113 Dennis Johnson also adjusted Mr. Walters' appraisal to reflect market appreciation in the Chelan area during the time period the Kenagys owned the property. He applied a 4 percent rate for slower economy years beginning in 1999, and a 15 percent rate beginning in 2003 because the local real estate values increased dramatically. He concluded that the 15 percent rate could reasonably be applied to the Kenagys' property because it was a premium property in 2005. Mr. Johnson valued the property at approximately $1.57 million before the view was obstructed.
¶ 114 Dennis Johnson used the actual sales price of $1.325 million that the Kenagys sold the property for in 2005 as the value following impairment of the view. He considered this to be the most appropriate measure because it was a negotiated, arm's-length transaction that reflected the property's fair market value considering the view corridor as it then existed. There were, moreover, no comparable sales at the time. Mr. Johnson then deducted the before value from the after value, to calculate the Kenagys' damages at $245,000.
¶ 115 The court found that Dennis Johnson did not conduct an "appraisal," but conducted an analysis of the damages based on impairment of the view corridor pursuant to USPAP Standard 4. It allows the opinion of value to originate from a source other than the consulting appraiser. These findings are supported by Dennis Johnson's testimony, the USPAP, and the history of the restaurant building and the Key Bay development. The trial judge did not then abuse his discretion by first admitting the testimony of Dennis Johnson or by relying on that testimony for his damage award:
Mr. Dennis Johnson was far and away the more credible expert witness and that his methodology is extremely logical and reasonable and it would require the Court to engage in inappropriate speculation to deviate from [his] conclusion regarding diminution in value to the Property.
CP at 571 (II CL 2.20).
¶ 116 Appellants Key Development, Jack Johnson, and Key Bay Homeowners Association also challenge specific underpinnings of Dennis Johnson's opinions, but all go to the weight to be given to expert witnesses' testimony. This is the province of the trier of fact. Kwik-Lok Corp. v. Pulse, 41 Wash. App. 142, 150, 702 P.2d 1226 (1985); see also Davis v. Dep't of Labor & Indus., 94 Wash.2d 119, 124, 615 P.2d 1279 (1980).
¶ 117 The appellants urge in the alternative that the use of Mr. Walters' report is inadmissible hearsay under ER 703. But that rule permits experts to base their opinions on facts or data that might not otherwise be admissible into evidence "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." ER 703. The rule is not designed to allow a witness to "`summarize and reiterate all manner of inadmissible evidence.'" State v. Martinez, 78 Wash.App. 870, 880, 899 P.2d 1302 (1995) (quoting 3 David Louisell & Christopher Nueller, Federal Evidence § 389, at 663 (1979)). But the trial court may allow the admission of hearsay evidence and otherwise inadmissible facts for the limited purpose of showing the basis of the expert's opinion. State v. Wineberg, 74 Wash.2d 372, 384, 444 P.2d 787 (1968); State v. Ecklund, 30 Wash. App. 313, 633 P.2d 933 (1981); 5B KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 703.5, at 232-33 (5th ed.2007).
¶ 118 That is what occurred here. First, Dennis Johnson's testimony was clearly helpful to the trier of fact. ER 702. Indeed, it was the only testimony on the question of damages. Dennis Johnson also testified that, consistent with USPAP Standard 4, it is common practice in the industry to rely on reliable and accurate past appraisals, and he followed that practice here. He testified that in a retrospective process, quality work previously done should not be disregarded by an appraiser. He also did not merely adopt Mr. Walters' report as his own. He followed standard procedures in independently verifying the data before relying on it. The court did not abuse its discretion in admitting the testimony under ER 703.
¶ 119 ISSUE NINE: Did the court abuse its discretion by denying the defense *1015 motion to continue the damages phase of the trial?
¶ 120 A motion for continuance is addressed to the discretion of the trial court, but the court must nevertheless comply with the applicable rules. N. State Constr. Co. v. Banchero, 63 Wash.2d 245, 247, 386 P.2d 625 (1963); Makoviney v. Svinth, 21 Wash.App. 16, 28-29, 584 P.2d 948 (1978). Motions to continue are governed by CR 40:
A motion to continue a trial on the ground of the absence of evidence shall only be made upon affidavit showing the materiality of the evidence expected to be obtained, and that due diligence has been used to procure it, and also the name and address of the witness or witnesses. The court may also require the moving party to state upon affidavit the evidence which he expects to obtain.
CR 40(e).
¶ 121 The Kenagys' counsel provided Dennis Johnson's report to defense counsel on May 10, 2007. Defense counsel did not depose Dennis Johnson. And they complained that discovery requests were outstanding. The Kenagys' counsel asked what information was sought and offered to waive the discovery cutoff date to accommodate. Defense counsel did not respond. The Kenagys' counsel then obtained a copy of Dennis Johnson's complete file and mailed copies to defense counsel on June 14, 2007.
¶ 122 Appellants Key Development, Jack Johnson, and Key Bay Homeowners Association moved to continue the trial on July 5; they had not yet identified an expert. The court denied the motion without prejudice but gave them a chance to obtain an expert and file affidavits showing compliance with CR 40(e). Trial remained set for July 31. The appellants retained their expert, Scot Auble, on July 10.
¶ 123 The appellants then renewed their motion to continue. The court denied that motion on July 25 because the appellants did not contact Mr. Auble until July 10, although they received Dennis Johnson's report in May. And they did not show what efforts, if any, they made to get an expert between the receipt of Dennis Johnson's report and the time they contacted Mr. Auble. The court concluded this showed a lack of diligence and refused to continue the trial. Those are tenable grounds for the judge to do what he did and therefore he did not abuse his discretion.

III.

ATTORNEY FEES, COSTS, AND INTEREST
¶ 124 In Washington, attorney fees may be awarded when authorized by a private agreement, a statute, or a recognized ground in equity. Fisher Props., Inc. v. Arden-Mayfair, Inc., 106 Wash.2d 826, 849-50, 726 P.2d 8 (1986). Whether a specific statute, contract provision, or recognized ground in equity authorizes an award of fees is a question of law we review de novo. Tradewell Group, Inc. v. Mavis, 71 Wash. App. 120, 126, 857 P.2d 1053 (1993). We review the amount of a fee award for abuse of discretion. Boeing Co. v. Heidy, 147 Wash.2d 78, 90-91, 51 P.3d 793 (2002).
¶ 125 ISSUE TEN: Did the court err in awarding attorney fees and costs to the Kenagys based on contract (the agreements) and statute (RCW 4.84.330)?
¶ 126 Here, the agreements contain an attorney fees and costs provision. Exs. 2, 3. In particular, paragraph 19 of the right-of-way agreement provides:
In the event of any controversy, claim, or dispute relating to this Agreement or the prior Agreement, or their breach, the prevailing party shall be entitled to recover reasonable expenses, costs, and attorneys fees.
Ex. 3 at 7.
¶ 127 RCW 4.84.330 provides: "As used in this section `prevailing party' means the party in whose favor final judgment is rendered."
¶ 128 Jack Johnson contends that he was not liable for attorney fees under the agreements because the court dismissed all contract claims against him personally on summary judgment. And the court's conclusion that he tortiously interfered with the agreements *1016 is effectively a conclusion that he was not a party to those agreements because claims of tortious interference with business relationships do not arise out of the underlying contract. Tradewell Group, 71 Wash. App. at 130, 857 P.2d 1053; W. Stud Welding, Inc. v. Omark Indus., Inc., 43 Wash. App. 293, 299, 716 P.2d 959 (1986). Thus, even if he is liable for tortious interference with the agreements, no contractual attorney fees should have been awarded on that claim.
¶ 129 First, the court did dismiss a claim for breach of the agreements by Mr. Johnson personally and as the "alter ego" of Key Development. The only surviving cause of action against him and the Homeowners Association was the tortious interference claim when the Kenagys amended their complaint to add it at the close of the liability trial.
¶ 130 The court concluded, as it did in the liability phase of the trial, that the Kenagys are third party beneficiaries of the agreements. CP at 14 (III CL 2.1). We have concluded that they are not third party beneficiaries, but nonetheless can enforce the agreements (with attorney fees provisions) as running covenants protecting the view from their restaurant. Leighton, 22 Wash.App. at 139, 589 P.2d 279.
¶ 131 The central issue here is whether the agreements effectively protected the views of the lake in perpetuity, whether the view had been impaired and, if so, what damages followed. The court may award attorney fees for claims other than breach of contract when the contract is central to the existence of the claims, i.e., when the dispute actually arose from the agreements. See Hemenway v. Miller, 116 Wash.2d 725, 742-43, 807 P.2d 863 (1991); Seattle-First Nat'l Bank v. Wash. Ins. Guar. Ass'n, 116 Wash.2d 398, 413, 804 P.2d 1263 (1991); Hill v. Cox, 110 Wash.App. 394, 411-12, 41 P.3d 495 (2002) (contractual fees awarded when prevailing party elected to proceed on statutory tort claim rather than contract); Edmonds v. John L. Scott Real Estate, Inc., 87 Wash.App. 834, 855-56, 942 P.2d 1072 (1997) (contract-based fees awarded for negligence claim when duty breached was created by parties' agreement); W. Stud Welding, 43 Wash.App. at 299, 716 P.2d 959 (contract-related tortious interference claim justified awarding of contract-based fees); 25 DAVID K. DEWOLF ET AL., WASHINGTON PRACTICE: CONTRACT LAW AND PRACTICE § 14:18, at 357 (2d ed.2007) (even in cases where plaintiff's claims are founded in tort or another legal theory, award of contract attorney fees may be appropriate).
¶ 132 Here, enforcement of the agreements and the claims that followed their breach is the essence of the Kenagys' tortious interference with contract claim against Mr. Johnson and the Homeowners Association. Key Development breached the contract and, of course, remains liable for costs and fees. And it makes no argument to the contrary.
¶ 133 We conclude, then, based on the fee provisions set out in the agreements that the court properly awarded fees jointly and severally against Key Development (for breach) and Jack Johnson and Key Bay Homeowners Association (for tortious conduct arising from the agreements). Accordingly, we need not address Jack Johnson's and the Homeowners Association's contentions that the court erred in awarding attorney fees based upon the doctrine of equitable indemnity.
¶ 134 ISSUE ELEVEN: Did the court err in denying the Taylors' and the Homeowners Association's contract-based attorney fees requests against the Kenagys?
¶ 135 The Taylors argue that they are entitled to fees against the Kenagys since the court found at the close of the liability trial that the Taylors were bona fide purchasers without notice. They argue, then, that they are a prevailing party and entitled to fees from the Kenagys under the agreements and RCW 4.84.330.
¶ 136 The trial court refused to award fees because the Kenagys' action against the Taylors was not contractual in nature  it was for building a home that blocked a view. And the fact that the Kenagys recovered damages from others due to the home being there does not provide a basis for the Taylors to recover fees from the Kenagys. We agree.
¶ 137 Moreover, the Taylors' arguments in the trial court were a bit different than the arguments that they make here on appeal. *1017 In their trial brief, the Taylors and the Homeowners Association said the issue was: "Whether Key Development misrepresented the sale transaction and/or breached the statutory warranty deed entitling the Taylors and the Key Bay [Homeowners Association] to damages and/or equitable indemnification?" CP at 887. They then specifically argued:
Should the Taylors prevail and Key Development is found to have misrepresented the condition of the property by failing to adequately disclose material facts, then the Taylors are entitled to their reasonable attorney's fees. The purchase and sale agreement also has a specific provision that entitles the prevailing party to attorney's fees and costs.
CP at 924. The Taylors next argued that Key Development breached the statutory warranty fulfillment deed. The Taylors and the Homeowners Association also argued they were entitled to equitable indemnification (ABC rule) against Key Development because of (A) Key Development's wrongful act or omission toward (B) Cosina del Lago's successor, the plaintiff Kenagys, that exposed or involved the Kenagys in litigation with (C) the Homeowners Association and the Taylors, who were not connected with the initial transaction or event (breach of the agreements). Manning v. Loidhamer, 13 Wash.App. 766, 769, 538 P.2d 136 (1975); CP at 925-27. The Taylors and the Homeowners Association argued that they were therefore entitled to attorney fees from Key Development based upon the agreements, RCW 4.84.330, and under equitable indemnity.
¶ 138 The court gave the Taylors what they asked for against Key Development and against Jack Johnson as well. The court's unchallenged conclusions of law provide that the Taylors are bona fide purchasers who took with no notice of the Kenagys' claims regarding the agreements; Key Development misrepresented the lot sale to the Taylors (there was a disagreement concerning the property; so the seller's report of vacant land was misleading); the Taylors are entitled to their damages and attorney fees as a result of the negligent and/or intentional misrepresentation, as the purchase and sale agreement contains an attorney fees provision; Key Development further breached the warranties under the fulfillment deed to the Taylors, entitling them to their damages and attorney fees; and, the Taylors are entitled to equitable indemnification from Key Development and Jack Johnson as a result of their actions or omissions that involved the Taylors in this litigation.
¶ 139 The court denied the Taylors' request for fees against the Kenagys since their claims were against others. But neither the Taylors nor the Homeowners Association submitted a fee request against Key Development or Mr. Johnson. And they make no such request against Key Development or Mr. Johnson here on appeal.
¶ 140 ISSUE TWELVE: Are the court's findings sufficient to support its award of attorney fees to the Kenagys?
¶ 141 Key Development, Jack Johnson, and Key Bay Homeowners Association next argue that the trial court failed to make findings of fact and conclusions of law sufficient for us to pass on its award of attorney fees. Mahler v. Szucs, 135 Wash.2d 398, 957 P.2d 632, 966 P.2d 305 (1998); Bentzen v. Demmons, 68 Wash.App. 339, 842 P.2d 1015 (1993). Specifically, they argue that the court failed to specify how it arrived at the figure of $243,000 for fees and $35,000 in costs. There is no analysis on whether the fees requested by the Kenagys were reasonable. There is no finding that the number of hours claimed and the hourly rates charged were reasonable. Nor is there any analysis or finding on whether some of the fees requested represented fees incurred on unsuccessful claims or were for duplicative efforts by the three law firms that represented the Kenagys throughout the litigation.
¶ 142 First, the party that receives the money judgment is the prevailing party when the question is one of money damages. Blair v. Wash. State Univ., 108 Wash.2d 558, 571, 740 P.2d 1379 (1987); Guillen v. Contreras, 147 Wash.App. 326, 333, 195 P.3d 90 (2008). Here, the central question in the case was damages for breach of the agreements. The Kenagys prevailed. The only defendant who prevailed on a major claim *1018 was the Taylors. The proportionality approach of Marassi v. Lau, then, does not apply in favor of Key Development, Mr. Johnson, or the Homeowners Association. Marassi v. Lau, 71 Wash.App. 912, 915-16, 859 P.2d 605 (1993), abrogated on other grounds by Wachovia SBA Lending, Inc. v. Kraft, 165 Wash.2d 481, 200 P.3d 683 (2009).
¶ 143 But a court may limit a party's recovery of attorney fees to those attributable to the claims upon which the party prevailed if the claims are separable. Kastanis v. Educ. Employees Credit Union, 122 Wash.2d 483, 502, 859 P.2d 26, 865 P.2d 507 (1993). The party claiming higher fees must show the claims are inseparable. Id. at 501, 859 P.2d 26; see also 14A KARL B. TEGLAND, WASHINGTON PRACTICE: CIVIL PROCEDURE § 37.16, at 580-81 (2003).
¶ 144 The court should be guided by the lodestar method in determining an award of attorney fees as costs. Mahler, 135 Wash.2d at 433, 957 P.2d 632. The trial court must first determine that counsel expended a reasonable number of hours in securing a successful recovery for the client. This necessarily requires that the court exclude any wasteful or duplicative hours and any hours pertaining to unsuccessful theories or claims and make a record of this:
In the past, we have expressed more than modest concern regarding the need of litigants and courts to rigorously adhere to the lodestar methodology. ... Courts must take an active role in assessing the reasonableness of fee awards, rather than treating cost decisions as a litigation afterthought. Courts should not simply accept unquestioningly fee affidavits from counsel. Nordstrom, Inc. v. Tampourlos, 107 Wash.2d 735, 744, 733 P.2d 208 (1987).
Consistent with such an admonition is the need for an adequate record on fee award decisions. Washington courts have repeatedly held that the absence of an adequate record upon which to review a fee award will result in a remand of the award to the trial court to develop such a record. ... Not only do we reaffirm the rule regarding an adequate record on review to support a fee award, we hold findings of fact and conclusions of law are required to establish such a record.
This case exemplifies the rationale for such a rule. The record discloses affidavits from four different counsel or firms who represented Mahler. We cannot discern from the record if the trial court thought the services of four different sets of attorneys were reasonable or essential to the successful outcome. We do not know if the trial court considered if there were any duplicative or unnecessary services.
Mahler, 135 Wash.2d at 434-35, 957 P.2d 632; see Bentzen, 68 Wash.App. at 349-50, 842 P.2d 1015 (specific findings of fact under the lodestar method are required to support a conclusion that the fees are reasonable).
¶ 145 Here, in its written findings and conclusions, the court first listed the 16 different attorney fees and cost declarations that it considered. It then made several findings relating to the legal and equitable bases for attorney fees; findings detailing Mr. Johnson's tortious conduct giving rise to liability; and findings relating to his threats to bury the Kenagys in legal fees. But none of these findings address those required by Mahler.
¶ 146 The court then found:
The following facts support the Court's decision regarding the amount to award for attorney's fees and costs to Kenagys. Defendants Taylors, Key Development Corporation, Jack Johnson and the Association have incurred approximately $231,000 in attorney's fees. Kenagys seek $292,000 in fees, thus approximately $62,000 more in attorneys fees than the defendants have incurred. It is reasonable that the plaintiffs would have incurred more attorney's fees and costs than the defendants because it is normally a lot harder to create a case than it is to shoot one down. Mr. Kenagy and his attorneys demonstrated unflagging tenacity in their pursuit to obtain justice in this hard fought, factually and legally complex case. The hourly rates charged by Mr. Todd were $160 and $175 per hour. Mr. Jackson charged $250 per hour. Mr. Kube *1019 charged $205 per hour and Ms. Dengate [the paralegal] charged $75 per hour.
CP at 14 (III FF 1.12). No party on appeal challenges the reasonableness of any hourly rate.
¶ 147 The court entered conclusions of law addressing the contract, statute, and equitable bases for the fees and cost award. The court then concluded:
The Court looking in hindsight at the case, will not award all of the attorney's fees and costs incurred by the Plaintiffs. For example, the design costs Plaintiffs incurred as to the cost of cure analysis in the amount of approximately $6,900 is not an awardable cost because the Kenagys had sold the property and the cost to cure analysis was not admitted expert testimony by the Court. Fees expended pursuing the cost to cure after Plaintiffs sold the property have been excluded.
CP at 15 (III CL 2.9). No one assigns error to this conclusion.
¶ 148 Finally, the court concluded "Kenagys are awarded reasonable attorney's fees in the amount of $243,000 and reasonable costs at $35,000." CP at 16 (III CL 2.10).
¶ 149 The Kenagys are correct that the award of costs should stem from the contract (the agreements) language and not the more limiting statute (RCW 4.84.330). And defense counsel agreed. RP (Jan. 16, 2008) at 91.
¶ 150 But Key Development, Jack Johnson, and Key Bay Homeowners Association are correct that the above findings of fact and conclusions of law are insufficiently specific to meet the standards required by Mahler to apply the lodestar principles (necessary nonduplicative work in support of successful claims and theories). Nor is there any finding detailing the costs and their reasonableness. The only pertinent portion of the court's oral opinion regarding the reasonableness of fees and costs appears at pages 87 through 92 of the January 16, 2008, Report of Proceedings. The excerpt is not sufficient to glean findings necessary to support the award of fees under Mahler, 135 Wash.2d at 434-35, 957 P.2d 632.
¶ 151 We then remand for the entry of appropriate findings of fact and conclusions of law to support the award of fees and costs attributable to the Kenagys' claims related to securing a successful recovery.
¶ 152 ISSUE THIRTEEN: Did the court err in applying a 12 percent interest rate on the judgment?
¶ 153 Key Development, Jack Johnson, and Key Bay Homeowners Association next argue that the court imposed the wrong interest rate  the 12 percent rate for contracts rather than the rate called for by RCW 4.56.110(3) for torts.
¶ 154 RCW 4.56.110 provides:
(3) Judgments founded on the tortious conduct of individuals or other entities, whether acting in their personal or representative capacities, shall bear interest from the date of entry at two percentage points above the equivalent coupon issue yield, as published by the board of governors of the federal reserve system, of the average bill rate for twenty-six week treasury bills as determined at the first bill market auction conducted during the calendar month immediately preceding the date of entry. In any case where a court is directed on review to enter judgment on a verdict or in any case where a judgment entered on a verdict is wholly or partly affirmed on review, interest on the judgment or on that portion of the judgment affirmed shall date back to and shall accrue from the date the verdict was rendered.
(4) Except as provided under subsections (1), (2), and (3) of this section, judgments shall bear interest from the date of entry at the maximum rate permitted under RCW 19.52.020 on the date of entry thereof. In any case where a court is directed on review to enter judgment on a verdict or in any case where a judgment entered on a verdict is wholly or partly affirmed on review, interest on the judgment or on that portion of the judgment affirmed shall date back to and shall accrue from the date the verdict was rendered. The method for determining an interest rate prescribed by this subsection is also the method for determining the *1020 "rate applicable to civil judgments" for purposes of RCW 10.82.090.
¶ 155 The question here is whether the judgment was "founded on" tort or "founded on" contract. See e.g., Little v. King, 147 Wash.App. 883, 887-90, 198 P.3d 525 (2008).
¶ 156 The court's judgment is based on the agreements as reflected in III Conclusion of Law 2.3 (central issue of dispute was extent of view protections of the agreements and extent of damages from those view protections not being honored); III Conclusion of Law 2.4 (contractual basis under agreements and statutory basis to award to the prevailing party, the Kenagys, their costs and attorney fees jointly and severally against Key Development, Mr. Johnson, and the Homeowners Association).
¶ 157 Enforcement of the agreements was the central issue in this case; there would have been no tort claims otherwise. Thus, for the same reasons that Mr. Johnson is liable for costs and fees under the contract (the agreements), the proper interest rate on the judgment is 12 percent as per RCW 4.56.110(4) (judgments shall bear interest from the date of entry at the maximum rate permitted under RCW 19.52.020).
¶ 158 The Kenagys also ask for fees on appeal based upon contract. This basis applies only to the parties jointly and severally liable on the contract  Key Development, Jack Johnson, and Key Bay Homeowners Association  not the Taylors.
¶ 159 We award fees on appeal to the Kenagys and remand to the trial court to determine the appropriate amount. RAP 18.1(i).

HOLDING
¶ 160 In sum, we remand for findings of fact and conclusions of law on the question of attorney fees and costs and an award of fees. We affirm the judgment against Key Development Corporation, Jack Johnson, and Key Bay Homeowners Association. We also affirm the trial court's denial of the Taylors' request for attorney fees against the Kenagys. We award fees on appeal to the Kenagys, and direct the trial court to determine the appropriate amount.
¶ WE CONCUR: BROWN and KORSMO, JJ.
NOTES
[1] Findings of Fact and Conclusions of Law regarding liability will be referred to as I Findings of Fact or I Conclusions of Law.

Findings of Fact and Conclusions of Law regarding damages will be referred to as II Findings of Fact or II Conclusions of Law.
Findings of Fact and Conclusions of Law regarding attorney's fees and costs will be referred to as III Findings of Fact or III Conclusions of Law.
[2] See UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE AND ADVISORY OPINIONS (Appraisal Standards Bd. of The Appraisal Foundation 2006) (USPAP). Washington has adopted the USPAP as the standard of practice governing real estate appraisal activities. WAC 308-125-200(1).