IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | No. 40529-0-III |
| | ) | (Consolidated with |
| J.S., | ) | Nos. 40530-3-III, 40531-1-III, |
| G.S, | ) | 40532-0-III) |
| C.H., | ) | |
| K.H. | ) | UNPUBLISHED OPINION |

STAAB, A.C.J. — Following a contested fact-finding and disposition hearing, the court found all four of K.H.'s (Mother) children dependent, placed them in-home with the Mother, and ordered services to address the Mother's parental deficiencies. The trial court concluded that C.H. was dependent pursuant to RCW 13.34.030(6)(b), based on abuse or neglect. Additionally, the court concluded that all four of the children were dependent pursuant to RCW 13.34.030(6)(c), because they had no parent capable of adequately caring for them.

The Mother appeals, contending that several of the court's findings were not supported by substantial evidence and in turn, that the findings did not support the conclusion of dependency on each of the children. Specifically, the Mother challenges the court's findings that C.H. was abused in the Mother's care, that the Mother's explanations were inconsistent with the medical records, and the injuries were not caused by the other children.

The Mother also challenges the findings supporting the court's conclusion that the Mother was not capable of safely parenting her children without court intervention. She contends that substantial evidence does not support the court's finding that K.H. tested positive for drugs at birth and the children were at risk due to a lack of medical care. In addition, she argues that the court's findings that the Mother allowed unsafe persons around the children were based on inadmissible hearsay.

Finally, the Mother contends that the remaining findings fail to support the conclusion that her children are dependent.

We affirm.

## BACKGROUND

K.H. is the Mother of the four children involved in this dependency, J.S., G.S., C.H., and K.H.[1] On December 1, 2023, the Department of Children, Youth, and Families (Department) filed a dependency petition alleging all four children were dependent. The Department alleged the Mother's barriers to safe parenting included "unmitigated chemical dependency, unaddressed mental health, and lack of appropriate parenting skills or knowledge, including inappropriate discipline leading to non-transitory and non-accidental bruising to [C.H.], and inability to provide for the children's basic needs like school or medical care." Clerk's Papers (CP) at 1642-43

---

[1] Because K.H. and her son share the same initials, she will be referred to as "the Mother" throughout this opinion for clarity.

2

At the shelter care hearing the court entered an order placing the children in-home with the Mother so long as she complied with certain conditions.

In February 2024, the Department moved to compel the Mother's compliance with the conditions for in-home placement, which had been set at the shelter care hearing. The court granted the motion, finding that the children were being harmed by the Mother's failure to follow through with the conditions set for safe placement. The court also found there was reasonable suspicion of substance use in the home and that it was concerning the Mother's reported use of cannabis to help her sleep and as a coping mechanism. The court also amended the shelter care order to explicitly require the Mother to maintain communication with the Department, the school, and daycare, and ordered that future UA[2] tests must be negative.

*Fact-finding and disposition on the dependency*

A contested fact-finding and disposition hearing was held over several days in March and April 2024. We summarize the evidence provided at this hearing and the court's findings.

The court found that the Mother had a significant child protective services (CPS) history including one prior dependency. In the last five years, the family had approximately 20 intakes reporting suspected child abuse or neglect. The Mother also

---

[2] Urinalysis.

3

has at least two founded findings of abuse or neglect. This history demonstrates a pattern and informs the opinions of the social workers and medical experts in this dependency.

In 2022, J.S., G.S., and C.H. were involved in a dependency. The Mother admitted that during the last dependency she was pregnant and gave birth to K.H., was using methamphetamine and alcohol, and did not have safe or stable housing. The court found that K.H tested positive for methamphetamine at the time of his birth, but the Mother contests the factual basis for this finding. The court also found that during the last dependency, the Mother was living at Rising Strong and was engaged in chemical dependency treatment. Based on an agreement between both parties, the last dependency was dismissed in December 2022. As part of its recommendations, the Department asked the Mother to re-engage in mental health counseling and to follow through with all medical and other needs for all of her children. The Mother admitted that she did not follow through with this recommendation and instead self-medicated with marijuana.

The following year, the Department received reports concerning both J.S. and G.S.'s school attendance. The principal documented at least one incident in which she needed to drive the children home from school because the Mother had not picked them up and she was unable to get a hold of her. Around this same time, C.H.'s attendance at her daycare became inconsistent. Additionally, there were reports that both C.H. and K.H. were frequently dropped off at daycare without underwear or appropriate clothes and without milk/formula for K.H.

4

Nos. 40529-0-III (Consol. with 40530-3-III, 40531-1-III, 40532-0-III)
*In re Dependency of J.S., G.S., C.H., K.H.*

On November 30, 2023, a CPS intake was initiated after C.H. was dropped off at Little Scholars Early Learning Center and had what was described as bruises on her. The daycare staff reported that they had noticed a bruise on C.H.'s upper thigh, rib cage, and leg. Based on her experience, and because C.H. had reported her Mother inflicted the injuries, a staff member contacted the Department to report suspected child abuse.

CPS social worker Madison Davis arrived and took photographs of the bruises with her phone. She sent the photographs to Kathy Ormsby, ARNP,[3] a child abuse medical expert who works at Partners with Families and Children (Partners). Upon reviewing the photographs, Ormsby diagnosed the marks as bruises and concluded that it did not appear to her that they were from an accidental injury. For this reason, she recommended that C.H. be seen in the emergency room. The Mother declined this recommendation, indicating that she wanted the children to be seen by their primary care physician although the children had been released due to repeated cancellations and no-shows.[4]

---

[3] Advanced Registered Nurse Practitioner.
[4] Prior to the current dependency petition being filed, the Department reported that C.H. was last seen by her primary care provider for a "sick appointment" back on November 8, 2022. Furthermore, K.H. was likewise last seen for a "sick appointment" in September 2023. G.S. was last seen on April 11, 2023, for a vaccine and J.S., on June 29, 2022, for a child well-exam. The medical records also demonstrated that C.H. and K.H. had inconsistent attendance for their medical appointments.

5

The next day (December 1) when C.H. did not show up to daycare and the other children were not at school, the Department went to the family home to speak with the Mother, but were unable to contact her. The Department then drafted a dependency petition for the children and asked for an emergent pick-up of the children from the home.

After the children were removed from the home, both C.H. and K.H. were seen in the emergency room. At the emergency room, it was noted that C.H. had "bruising to [her] left thigh and lower back" and that it appeared she had a "Mongolian spot at the base of her spine." CP at 1652. K.H. was diagnosed with a diaper rash but no bruising was noted.

Two medical experts testified at the fact-finding hearing: Ormsby for the Department and Dr. Niran Al-Agba for the Mother. Both experts reviewed C.H.'s medical records, the family's intake history, as well as the photographs taken at the daycare and at the emergency room. The court found the testimony of both experts to be helpful and accepted parts of their respective opinions as credible based on their specialized expertise and the facts in this case.

Ormsby testified that the photographs of C.H from the daycare showed bruising that is typically the result of finger-tip type bruising. Additionally, she explained that, because children are top heavy, accidental injuries tend to be on the front part of a child's

body. However, when bruises are in more protected areas, it is a concern for intentional injury. She also indicated there was semi-oval bruising on C.H.'s lower buttocks.

Ormsby also testified about the children's medical history. She indicated that the children had inconsistent attendance in their medical appointments. In particular, K.H. had been diagnosed with eczema, which, if left untreated, could cause discomfort and put him at risk for infection. Ormsby testified to the importance of medical care and explained that a child exposed to drugs in-utero often has higher medical needs that could worsen with infection. Furthermore, she opined that the failure to have routine medical care puts a child at significant risk of substantial danger or harm.

Dr. Al-Agba testified for the Mother. She testified that photographs are not a reliable scientific method for making a diagnosis and that to diagnose bruising, a physical examination is necessary. Dr. Al-Agba disagreed with Ormsby's opinion and concluded, based on her review of the records and photographs, that C.H.'s injuries did not constitute physical abuse. Generally, Dr. Al-Agba also stressed the importance of medical care for younger children and the concern she would have if a parent failed to ensure their children received routine care.

Justine Hudson was assigned as the ongoing social worker to this case. At the hearing, she was called to testify as both a fact witness and an expert witness in child welfare and social work. She identified the Mother's parental deficiencies as physical abuse toward C.H. and her inability to follow through with the children's school

attendance and appointments, which were important for their development as well as social and emotional needs. She opined that physical abuse could sever the bond between a parent and a child and make them feel afraid to speak to others as well as emotionally damage them.

Likewise, she opined that the lack of medical care endangers a child's physical and psychological development because preventative care ensures they stay healthy, and if they are sick, it affects them educationally, socially, and emotionally. Additionally, although Hudson had not received reports that the Mother behaved inappropriately while under the influence, she was concerned that substance use could lead to a parent being unavailable to the children and their needs. She felt that the Mother's admitted use of cannabis could affect her judgment and supervision of the children.

Based on her review of relevant records and investigations, Hudson's expert opinion was that C.H. had been abused and that the Mother was not capable of adequately parenting her children. Additionally, she opined that remedial services and court ordered conditions of placement, including consistent attendance at school or daycare, were needed to ensure the safety of the children.

Social Worker Madison Davis also testified as a fact witness and an expert witness. She concluded that the Mother's unaddressed deficiencies put the children in circumstances that constituted substantial danger to their psychological or physical development. She opined that the Mother could not safely care for the children without

Department assistance due to the children's medical care, education, and supervision needs. Furthermore, she explained that the Mother had not followed through with recommendations from the last dependency and it was unlikely she would engage in services to address the concerns. In addition, Davis indicated that the Mother's mental health impacted her ability to supervise the children and address their needs.

The Mother also testified at the hearing. She admitted to regularly using marijuana to help with sleep but added that she did not consider it a mind or mood-altering substance or that it put her children at risk of harm. However, she explained that at the time of the hearing she was sober from all substances because the court's order prohibited such use.

The Mother also testified about the children's medical history. She indicated that K.H. has specialized medical needs. The Mother testified that when K.H. was approximately four months old, he spent 15 days at Sacred Heart Hospital, when he had COVID-19, bronchitis, and double ear infections. He was discharged with a feeding tube for three-and-a-half to four months. The Mother noted that K.H. has a current diagnosis for eczema as well as lactose intolerance. The last medical appointment the Mother remembered K.H. attended was when he had chickenpox. At the time of the hearing, K.H. was using prescription hydrocortisone cream. G.S. had a prescription for albuterol and took this with a nebulizer when needed for asthma. The Mother also described G.S. as having behavior problems.

During the Mother's testimony, she was asked about C.H.'s bruises. She explained that any statements from C.H. that the Mother inflicted the injuries were a lie and that C.H. "says some pretty crazy things sometimes." Rep. of Proc. (RP) at 216. She stated that C.H. received a bruise on her hip after falling from her scooter. She indicated the bruises on C.H.'s legs were from accidents or roughhousing with her brothers and that the spot on her back was not a bruise but rather a "Mongolian" spot.

The principal of the school the children attend, also testified at the hearing. She explained that there is a difference between behavioral and academic intervention and that J.S. was a full year behind academically. Gillmer indicated that J.S. had missed so much school that it was possible he needed an "Individualized Educational Plan" (IEP),however, because of the Mother's failure to get him to school consistently, the school was unable to properly evaluate him. By missing school, she opined that it prevented him from accessing services he may need to be successful in school and life, which significantly impacted his development.

As it relates to G.S., he demonstrated escalated behavior in his classroom. He would often elope from the classroom and the school had difficulty getting ahold of the Mother when this occurred. Additionally, there was a delay in getting G.S. in the IEP process due to the actions of his Mother. The previous IEP was put on hold while the Mother followed up with the necessary paperwork and with his developmental assessments. The school tried to initiate the process again, but the Mother was not

available to sign the final plan. Eventually, a final plan was put in place because the school was able to reach G.S.'s adult brother who could sign it. As a result of these constant delays, it caused substantial damage to G.S.'s development and an increase in emotional dysregulation, which impacted his ability to develop at school as well as psychologically.

*Dependency findings*

At the conclusion of the dependency hearing, the court entered several relevant findings. The court identified the Mother's barriers to being a safe parent as her unmitigated chemical dependency, unaddressed mental health, and lack of appropriate parenting skills or knowledge. In particular, the court identified inappropriate discipline leading to non-transitory and non-accidental bruising to C.H. as well as the inability to provide for her children's basic needs like school or medical care.

The court found the testimony of both Ormsby and Dr. Al-Abga to be helpful. As an initial matter, the court rejected Ormsby's attempt to diagnose bruises on C.H. from the daycare photographs. Instead, the court agreed with Dr. Al-Agba that the standard of practice requires a physical examination to diagnose bruising. Nevertheless, the court found the physical exam taken at the hospital to be credible and based on the diagnosis of medical providers at the emergency room, found that K.H. had marks consistent with bruising on her left thigh and lower back.

Additionally, the court found that the Mother's reason for the bruises was not consistent with the medical evidence. Although the Mother believed the injuries could have been inflicted by rough housing, the court accepted Ormsby's opinion that the bruising could not be the result of rough housing from other children based on the size and pattern of the bruises. The court also found by a preponderance of the evidence that the Mother was the person responsible for C.H.'s care and the cause of the bruising.

Furthermore, the court found that at the time of the initial petition, the children were behind on their routine medical appointments. The court was concerned that they had missed so many appointments that it led to their discharge from a previous provider and that this was serious given their young age. This put them at risk of serious harm, particularly K.H., including substantial damage to their physical development as testified to by the social workers and Ormsby.

Additionally, the court found that the Mother's marijuana use directly impacted her ability to safely parent the children and provide for their needs. It also found that the Mother was pregnant and gave birth to K.H. during her last dependency, and that at the time of K.H.'s birth, he tested positive for methamphetamine, but was never removed from the Mother's care. The court discussed the Mother's history with marijuana use and noted that it was unclear and concerning what information the Mother was relying on for her decision to use mood and mind-altering substances to address her sleep concerns and anxiety.

12

The Mother also had a diagnosis for anxiety disorder, depression, and stimulant use disorder. Untreated mental health was a previous parental deficiency, and she had not followed through with treatment after her last case was dismissed. Additionally, the Mother would report that she needed to address her mental health but then would refuse to engage.

Finally, the court found that the Mother allowed unsafe persons in the home around the children. Specifically, the court found that the Mother lived in housing where several families were involved with CPS. Accordingly, she was limited in neighbors she could rely on to assist with her children. In one situation, she asked a neighbor with a concerning dependency and criminal history to watch C.H. While the Mother denied knowing the neighbor's history, the court found it equally concerning that the Mother would not want to know the background of individuals before having them supervise her children.

The court also found that the Mother allowed a previously alleged father, C.G., to live in the home. Social worker Hudson was allowed to testify over a hearsay objection that the children told her that C.G. was living in the home. The Mother denied he was living in the home but acknowledged that he was visiting. The court found credible the Department's opinion that he was living in the home and was unsafe. The court found this opinion credible because of the reports the social worker received from the children.

Based on all the evidence presented, the court entered dependency findings for J.S., G.S., C.H. and K.H. In particular, it found that C.H. was dependent pursuant to RCW 13.34.030(6)(b) based on abuse or neglect. Additionally, it found all four children dependent pursuant to RCW 13.34.030(6)(c) because the children had no parent capable of adequately caring for them such that they were in circumstances which constituted a danger of substantial damage to their psychological or physical development.

The Mother appeals.

## ANALYSIS

EVIDENCE OF ABUSE OF C.H.

The Mother contends that substantial evidence does not support several of the court's findings and in turn, the findings do not support the conclusion that C.H. is a dependent child under RCW 13.34.030(6)(b). In particular, she contends the court erred by finding (1) Ormsby's opinion credible when she did not consider whether the marks could have been caused by an adult-sized child, (2) that the Mother's explanation for the bruises did not match medical evidence, and (3) the Mother physically abused C.H. when this finding was not supported by the other findings. Additionally, the Mother contends that there was no evidence that supports the conclusion that the other children were dependent pursuant to RCW 13.34.030(6)(b). The Department responds, arguing that substantial evidence supports the finding that C.H. received non-accidental bruising while in the Mother's care and that C.H. was abused.

14

As an appellate court, our role is "limited to assessing whether substantial evidence supports the trial court's findings." *In re Parental Rights to D.H.*, 195 Wn.2d 710, 718, 464 P.3d 215 (2020). "Substantial evidence" requires this court to determine if the evidence is "sufficient to persuade a rational, fair-minded person of the truth of the finding." *In re Estate of Jones*, 152 Wn.2d 1, 8, 93 P.3d 147 (2004). Unchallenged findings will be treated as verities on appeal. *Id*.

When a dependency proceeding is initiated, the State must prove, by a preponderance of the evidence, that the child meets the statutory definition of a "dependent child." *In re Welfare of Ca.R.*, 191 Wn. App. 601, 608, 365 P.3d 186 (2015). As relevant here, a child is considered dependent if they are "abused or neglected as defined in chapter 26.44 RCW by a person legally responsible for the care of the child." RCW 13.34.030(6)(b). "Abuse or neglect," in turn, means "injury of a child by any person under circumstances which cause harm to the child's health, welfare, or safety." RCW 26.44.020(1).

The Mother challenges several of the trial court's findings, arguing that they are not supported by substantial evidence because the trial court failed to consider evidence or misinterpreted evidence. We reject these arguments because they raise issues of credibility. As an appellate court, we do not reweigh evidence or witness credibility. *In re Dependency of A.VD.,* 62 Wn. App. 562, 568, 815 P.2d 277 (1991).

15

For example, the Mother contends that the trial court erred in relying on the opinion of Ormsby that the Mother was the cause of bruising on C.H. She contends that Ormsby's testimony on this issue was not credible because it did not consider whether a larger child could cause the bruises. But Ormsby rejected the possibility of C.H.'s older siblings as the cause of the bruises. Regardless, whether her opinion properly gave weight to certain factors goes to credibility, a question for the trial court.

Likewise, the Mother challenges the trial court's finding that the Mother's explanation for the bruising was not credible. She contends that the trial court misapprehended the Mother's testimony and improperly relied on the testimony of Ormsby who she claims conflated statements made by the Mother and C.H. Again, these challenges go to the weight and credibility of testimony assigned by the trial court. Whether Ormsby explained her reasoning or considered certain evidence in developing her conclusion goes to the credibility of her conclusion.

Next, the Mother challenges the trial court's finding that social workers Davis and Hudson had testified that in their opinion C.H. had been abused by the Mother. Although the State concedes that Hudson's opinion was not supported by substantial evidence, even without this finding or the Mother's explanation for the bruising, the conclusion that C.H. was dependent based on neglect or abuse is supported by substantial evidence. *See Dalton v. State*, 130 Wn. App. 653, 670, 124 P.3d 305 (2005) (supportive evidence was ample to support the conclusion even with unwarranted deference to other findings);

16

*Andren v. Dake*, 14 Wn. App. 2d 296, 472 P.3d 1013 (2020) (conclusion was supported by substantial evidence even with findings not adequately supported by the record).

The relevant definition of a "dependent child" is "any child who: . . . [is] abused or neglected." RCW 13.34.030(6)(b). Likewise, "abuse" means "injury of a child by any person under circumstances which cause harm to the child's health, welfare, or safety, excluding conduct [reasonably and moderately inflicted to restrain or correct a child]," while "neglect" means "the negligent treatment or maltreatment of a child by a person responsible for or providing care to the child." RCW 26.44.020(1).

After C.H. reported to daycare staff that her injuries were inflicted by her Mother, they contacted the Department to report the suspected child abuse. Once C.H. was examined at the emergency room, medical professionals took photographs, conducted laboratory tests, and noted bruising to C.H.'s left thigh and lower back. The Mother does not assign error to any of these findings; thus, they are verities on appeal. *In re Estate of Jones*, 152 Wn.2d at 8.

Ormsby, qualified as an expert in child abuse, provided testimony that the court found credible. Her conclusion that the bruising was caused by abuse was based on her experience and her review of C.H.'s history, medical provider notes, imaging, and laboratory studies. The court's findings and conclusion that C.H. was a dependent child based on abuse or neglect is thus supported by substantial evidence.

17

Nos. 40529-0-III (Consol. with 40530-3-III, 40531-1-III, 40532-0-III)
*In re Dependency of J.S., G.S., C.H., K.H.*

Finally, the Mother contends no findings support the court's conclusion that the other three children were dependent pursuant to RCW 13.34.030(6)(b) for abuse or neglect. The Mother misunderstands the court's findings. Although the basis of dependency for C.H. was neglect or abuse, the dependency was also established for all four children upon the court's finding that the children have no parent adequately caring for them such that the circumstances constitute a danger of substantial damage psychologically or to their physical development pursuant to RCW 13.34.030(6)(c). Therefore, there was no finding of abuse or neglect for the other children as the Mother contends.

EVIDENCE THAT NO PARENT WAS CAPABLE OF SAFELY PARENTING THE CHILDREN

The Mother contends the trial court erred by concluding that she was not capable of safely parenting her children without court intervention. In particular, she assigns error to the findings that K.H. tested positive for methamphetamine at the time of his birth and the children were at risk of serious harm due to a lack of medical care. Additionally, she challenged findings related to C.G. living in the home as based on hearsay. Finally, she argues that the remaining findings do not support the conclusion that the children were dependent pursuant to RCW 13.34.030(6)(c). The State responds, conceding that the finding regarding K.H. testing positive for methamphetamine was not supported by substantial evidence. However, the State contends the remaining findings

18

are supported by substantial evidence and support the conclusion that the children were dependent pursuant to RCW 13.34.030(6)(c).

The Mother contends that substantial evidence does not support the conclusion that the children are dependent pursuant to RCW 13.34.030(6)(c). Under this subsection, a child is considered dependent if he or she has "no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development." RCW 13.34.030(6)(c). However, a finding of actual abuse or neglect is not necessary to find a child dependent under subsection 6(c). *In re Welfare of X.T.*, 174 Wn. App. 733, 737, 300 P.3d 824 (2013). Nor is it necessary for the court to find the parent "unfit." *In re Dependency of Schermer*, 161 Wn.2d 927, 944, 169 P.3d 452 (2007).

### 1. *K.H. testing positive for methamphetamine at birth*

The Mother first challenges the trial court's finding that K.H. tested positive for methamphetamine at the time of his birth and the Department conceded. As both parties note, the evidence demonstrated that the Mother used methamphetamine during the initial stages of her pregnancy, exposing K.H. to substances in-utero. However, while the Mother gave birth to K.H., she resided at Rising Strong and tested negative on urinalysis tests performed there. Consequently, this finding is not supported by substantial evidence.

19

2. *Unsafe persons in the home*

K.H. next challenges the court's finding that C.G., a previously alleged father to K.H., was living in the home and was unsafe. She argues that this finding was based on inadmissible hearsay. The State contends that the court did not rely on hearsay as substantive evidence but instead, relied on the opinion of Hudson to find that the Mother had allowed an unsafe individual around the children. Regardless, the State claims any alleged hearsay considered by the court did not materially affect the trial court's outcome.

During the fact-finding hearing, Hudson was asked if she was "aware of any inappropriate or unauthorized people with the children in the home?" RP at 1024. Hudson testified that she had observed the Mother allow a neighbor with significant dependency history to watch the children.

Hudson also testified that two of the children had conveyed to her that C.G. had been living on and off in the home. Hudson added that C.G. had a recent assault conviction. When asked to testify about statements made by C.G., the Mother raised a hearsay objection. In response, the Department asked that the hearsay come in for disposition purposes but also argued that the hearsay was the basis for Hudson's opinion as an expert in child welfare. The court overruled the objection. Hudson continued to testify about statements made by C.G. at an earlier hearing. Based on this testimony, the court found "credible the Department's opinion that [C.G.] was living in the home and was unsafe." CP at 1673.

20

A hearsay statement is one made by an out-of-court declarant offered to prove the truth of the matter asserted. ER 801(c). These rules apply at dependency hearings and generally bar the court from relying on a hearsay statement for its truth. RCW 13.34.110(1); ER 801(c), 802. Parents "should not be deprived of their parental rights on hearsay." *In re Dependency of A.C.*, 1 Wn.3d 186, 192, 525 P.3d 177 (2023).

A hearsay statement is generally inadmissible unless an exception applies. *Id*. One exception to the general rule against hearsay allows an expert to relay facts that "need not be admissible in evidence" to show the basis for their expert opinion. ER 703. But ER 703 "is not designed to allow a witness to 'summarize and reiterate all manner of inadmissible evidence.'" *Deep Water Brewing, LLC v. Fairway Res. Ltd.*, 152 Wn. App. 229, 275, 215 P.3d 990 (2009) (internal quotation marks omitted) (quoting *State v. Martinez*, 78 Wn. App. 870, 880, 899 P.2d 1302 (1995)). Even when hearsay is admitted under ER 703, "a judge cannot rely on that hearsay as substantive evidence." *A.C.*, 1 Wn.3d at 192.

Here, the social worker's testimony on where C.G. was living was a fact not an opinion. Hudson was asked if she was aware of inappropriate people in the house with the children. Her testimony that C.G was living in the home was based on hearsay statements of the children. Just because Hudson was qualified as an expert does not mean that her entire testimony can be characterized as an opinion. C.G.'s place of residence is a fact, not an opinion. On the other hand, her testimony that C.G. was unsafe

21

was an opinion. While Hudson could consider C.G.'s living arrangements to support her opinion that C.G. was not safe, the court erred by adopting this hearsay statement as substantive evidence of a fact. *See Id*. at 192-93.

Finding error, we must determine if the error "materially affected" the outcome of the trial. *Id*. at 194. Under this standard, "'[a]n erroneous admission of evidence is not prejudicial unless, within reasonable probabilities, the outcome of the trial would have been *materially affected* had the error not occurred.'" *Id.* (internal quotation marks omitted) (quoting *In re Welfare of X.T.*, 174 Wn. App. at 739). In *A.C.*, the court found that within reasonable probabilities, the impermissible reliance on hearsay prejudiced the parents and materially affected the outcome of the trial. 1 Wn.3d at 197. However, in *A.C.*, there was "an enormous amount" of hearsay that included "accounts of domestic abuse, criminal warrants, heavy cannabis use, confrontations with medical staff, [the child]'s] potential 'developmental delays' and alleged physical disability, and—most damaging for [the parent]—multiple encounters with the police." 1 Wn.3d at 196. Such is not the case here.

In this case, the court found that there were "Unsafe Persons in the Home." CP at 1672. While this finding was based in part on hearsay, the hearsay did not materially affect the outcome of the hearing. The Mother admitted that C.G. had been to the home but denied that he stayed overnight or was alone with the children. She acknowledged that he had a criminal and substance use history. Regardless, the finding of unsafe

22

persons in the home was also based on the Mother's admission of allowing a neighbor with a concerning CPS and criminal history to watch her children.

Finally, the finding of unsafe persons in the home was only one of several deficiencies that the court found. Other deficiencies included (1) her inability to provide for the children's basic needs, (2) unmitigated chemical dependency, (3) unaddressed mental health, and (4) the lack of appropriate parenting skills. The court acknowledged that this was a "very hard" case but stressed that the finding of dependency was based on a culmination of factors, not any one parental deficiency. RP at 1206. Based on the numerous findings that contributed to the dependency, we conclude that there is not a reasonable probability the outcome would be different without this one piece of evidence.

3. *Medical care*

The Mother also contends substantial evidence did not support the court's finding that the children were at risk of serious harm due to a lack of routine medical care.

Although parents have a fundamental liberty interest in the care and welfare of their minor children, the State also has an interest "in protecting the physical, mental, and emotional health of children." *Schermer*, 161 Wn.2d at 941. It is thus "well established that when a child's physical or mental health is seriously jeopardized by parental deficiencies, 'the State has a parens patriae right and responsibility to intervene to protect the child.'" *Id.* (quoting *In re Welfare of Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108

(1980)).  Furthermore, a parent's "inability to provide necessary medical care, including mental health care, may support a dependency finding." *Id*. at 947.

Here, the evidence demonstrated that the children lacked routine medical care. C.H. had last seen a medical provider in November 2022, but this was for a sick exam rather than a routine child well-exam.  Additionally, the last time J.S. was seen by a doctor was in June 2022, and G.S. in April 2023.  In the last dependency, K.H. indicated she would follow through with medical appointments or counseling for herself although she did not.  Instead, the children had been dismissed from their pediatrician  because of no-show and missed appointments.

As it relates to K.H., in particular, he had specialized medical needs.  At birth, K.H. spent 15 days in Sacred Heart Medical Center, where he had COVID-19, bronchiolitis, and double ear infections.  After he was discharged, he had a feeding tube for three-and-a-half to four months.  And, at the time of the dependency hearing, K.H. had eczema as well as lactose intolerance.  The last appointment the Mother could recall for K.H. was when he had chickenpox.  Sufficient medical care is a factor courts may consider for a dependency especially for a child with special medical needs.  *See In re Dependency of T.L.G.*, 126 Wn. App. 181, 186 n.2, 108 P.3d 156 (2005) (recognizing that "the challenges of parenting a child with special medical needs" was an appropriate factor for the trial court to consider in evaluating whether the parents could adequately care for the child under RCW 13.34.030(6)(c)).

24

At the hearing, several witnesses testified regarding the importance of routine medical care. For example, the Mother's expert, Dr. Al-Agba, stressed the importance of medical care for younger children and her concern if a parent failed to ensure their children received routine care. With respect to K.H., Ormsby testified that a child exposed to drugs in-utero often has higher needs and symptoms that could worsen with infection and that he was at significant risk of substantial danger or harm if he did not have consistent medical care. Furthermore, Hudson explained how the lack of medical care can affect a child's health, which can then prevent school attendance. This finding is supported by substantial evidence.

On appeal the Mother points to the Department's website and argues that it provides specific information regarding when children should receive well-exams and that not all children receive annual well-exams. She contends the children were "not especially behind on their medical care" and that their appointments "essentially" aligned with the Department's recommendations. Appellant's Br. at 59. The data contained on the website and relied on by the Mother on appeal was not used during cross-examination at the dependency hearing. Likewise, the failure to raise the "inability to provide" argument below prevented the court from considering it. Regardless, her inability to provide is a factor a court may consider in support of a dependency. *See Schermer*, 161 Wn.2d at 947.

4. *Whether the remaining findings support the conclusion the children were dependent*

The Mother next contends that the remaining findings did not support the conclusion that the children were dependent pursuant to RCW 13.34.030(6)(c). She explains that the remaining findings establish that she had inconsistent communication with the school and providers, she struggled to get the children to school, and they were often absent or tardy. Furthermore, she concedes she was not in mental health treatment and self-medicated with marijuana. However, these are some of the very findings, supported by substantial evidence, that uphold the conclusion that the children were dependent.

As discussed above, the Mother failed to ensure the children received regular medical care. Likewise, the children chronically missed school, demonstrating an inability to provide for their basic needs. Additionally, the court found that the Mother's continued cannabis use directly impacted her ability to safely parent and provide for their needs. Furthermore, she has an extensive history with substances including methamphetamine, alcohol, and marijuana. Additionally, the behavior of disengagement from services, consistent with prior behavior during relapse, and the lack of contact were indicative to the court that she was using mind-altering substances.

26

The Mother also had a diagnosis of anxiety disorder, depression, and stimulant use disorder. This was a previous deficiency in her last dependency, and she did not follow through with care after dismissal. Additionally, the court found that the Mother was using substances to self-treat her mental health rather than seeking treatment. Even when mental health counseling had been court ordered and expected for the Mother to follow through with therapy, she did not. Based on this evidence, the court did not have an expectation the Mother would follow through with services and address her mental health without court intervention.

Despite the findings above, the Mother asserts that the evidence also showed that she was a capable and caring Mother, citing several facts to demonstrate this point. Although it is most likely true that the Mother has redeeming qualities, our review is limited to whether substantial evidence supports the court's findings and whether those findings support the conclusion of dependency. *In re Welfare of Ca.R.*, 191 Wn. App. at 601. "[W]e do not reweigh evidence." *Id*. at 609. Reweighing these positive qualities against the other evidence presented at trial is outside our scope of review on appeal. Consequently, this argument must fail.

The court's finding that the children were dependent because they had no parent capable of caring for them was supported by substantial evidence.

Nos. 40529-0-III (Consol. with 40530-3-III, 40531-1-III, 40532-0-III)
*In re Dependency of J.S., G.S., C.H., K.H.*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Staab, A.C.J.

WE CONCUR:

_____
Murphy, J.

_____
Cooney, J.

28